UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ALETHA BENTELE, JAMES BONSER, SCOTT CHRISTENSEN, GAY DEPUTEE, SCOTT DERCKS, DONALD DOUTHIT, F. DONALD FELLOW, DIANNA GILMORE, GERALD GIRARD, MICHELLE GWIN, RUTH HART, DAVID HERNANDEZ, EMMA JENSEN, EDWARD JOHNSON, RICHARD KNAUSS, ANGELA KRITSELIS, SUSAN LANDIS, JOHN LOSCHEN, ROBERT LOWMAN, SEAN MAC AN AIRCHINNIGH, JEANNE MACNITT, LAWRENCE MANDEL, ANNE OLINGER, JULIANA PATTON, MARILYN PERSON, BRIAN PHAIR, PATRICIA QUINT, ROBYN RUSHING, MARIE SAFFRAN, MARK SCHLOEMER, HOWARD SCHURR, TREMAYNE SIRMONS, EDWARD STANFORD, MICHAEL STARR, BRET STEWART, MOLLY THOMPSON, JON UGLAND, HECTOR J. VALDES, SR., AND KARYN WOFFORD, | C.A. No.<br><br>**CLASS ACTION COMPLAINT** |

                                   Plaintiffs,

        v.

ELI LILLY AND COMPANY,

                                   Defendant.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  PARTIES ............................................................................................................ 10

    A.  Plaintiffs ................................................................................................. 10

        1.  Arizona Plaintiffs. ..................................................................... 10

            a.  F. Donald Fellow. ......................................................... 10

            b.  Michelle Gwin. ............................................................. 10

            c.  Ruth Hart. ..................................................................... 11

        2.  California Plaintiffs. ................................................................... 11

            a.  Jeanne MacNitt. ............................................................ 11

            b.  Juliana Patton. .............................................................. 12

            c.  Mark Schloemer. .......................................................... 12

        3.  Colorado Plaintiff. .................................................................... 12

            a.  Donald Douthit. ............................................................ 12

        4.  Florida Plaintiffs. ...................................................................... 13

            a.  Sean Mac an Airchinnigh. ............................................ 13

            b.  Edward Johnson. ........................................................... 13

            c.  Anne Olinger. ............................................................... 13

            d.  Howard Schurr .............................................................. 14

            e.  Tremayne Sirmons. ....................................................... 14

            f.  Hector J. Valdes, Sr. ..................................................... 14

        5.  Georgia Plaintiffs. .................................................................... 15

            a.  Marilyn Person. ............................................................ 15

            b.  Karyn Wofford. ............................................................ 15

010646-11 1023320 V1

6.      Idaho Plaintiff. ................................................................................. 15

        a.      Emma Jensen. ................................................................. 15

7.      Iowa Plaintiff. ................................................................................. 16

        a.      Richard Knauss. ............................................................. 16

8.      Louisiana Plaintiff. ......................................................................... 16

        a.      Robyn Rushing. .............................................................. 16

9.      Maine Plaintiff. ............................................................................... 16

        a.      Molly Thompson. ........................................................... 16

10.     Maryland Plaintiff. .......................................................................... 17

        a.      Brian Phair. ................................................................... 17

11.     Massachusetts Plaintiffs. ................................................................ 17

        a.      Gerald Girard. ............................................................... 17

12.     Michigan Plaintiffs. ........................................................................ 18

        a.      Susan Landis. ................................................................. 18

        b.      Patricia Quint. ............................................................... 18

13.     Minnesota Plaintiff. ........................................................................ 18

        a.      Jon Ugland. .................................................................... 18

14.     Missouri Plaintiff. ........................................................................... 19

        a.      Aletha Bentele. .............................................................. 19

15.     Montana Plaintiffs. .......................................................................... 19

        a.      James Bonser. ................................................................. 19

        b.      Gay Deputee. .................................................................. 19

16.     Nebraska Plaintiff. .......................................................................... 20

        a.      John Loschen. ................................................................. 20

17.     Nevada Plaintiffs. ............................................................................ 20

|  |  | a. | Marie Saffran. | 20 |
|  | 18. | | New Jersey Plaintiffs. | 20 |
|  |  | a. | David Hernandez. | 20 |
|  |  | b. | Lawrence Mandel. | 21 |
|  | 19. | | New York Plaintiffs. | 21 |
|  |  | a. | Robert Lowman. | 21 |
|  | 20. | | Texas Plaintiff. | 22 |
|  |  | a. | Bret Stewart. | 22 |
|  | 21. | | Utah Plaintiffs. | 22 |
|  |  | a. | Scott Christensen. | 22 |
|  |  | b. | Dianna Gilmore. | 22 |
|  | 22. | | Washington Plaintiff. | 23 |
|  |  | a. | Edward Stanford. | 23 |
|  | 23. | | Wisconsin Plaintiffs. | 23 |
|  |  | a. | Scott Dercks. | 23 |
|  |  | b. | Angela Kritselis. | 23 |
|  |  | c. | Michael Starr. | 24 |
| B. | | | Defendant | 24 |
| C. | | | Unnamed Insulin Manufacturers | 25 |
| III. | | | JURISDICTION AND VENUE | 25 |
| IV. | | | DRUG PRICING IN THE UNITED STATES | 26 |
| A. | | | Entities Involved in Drug Pricing | 26 |
| B. | | | The Drug Payment & Distribution Structure | 27 |
| C. | | | Benchmark Pricing is a Basis for Reimbursement | 30 |
| D. | | | Consumer Drug Costs | 32 |

- iii -

|  | E. | Impact on Consumers ................................................................ 40 |
|  | F. | Drug Manufacturer Manipulation of PBM Incentives ........................ 41 |
| V. | | ANALOG INSULIN ................................................................ 44 |
|  | A. | Diabetes: The Disease and Demographics ................................ 44 |
|  | B. | The Origins of Insulin Treatment ........................................ 47 |
|  | C. | Current Insulin Treatment Landscape .................................... 52 |
|  | D. | Climbing Insulin Benchmark Prices ...................................... 54 |
|  | E. | Novo Nordisk, Eli Lilly, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status. ................................................................ 64 |
|  | F. | Lilly's benchmark price inflation deceived and harmed the plaintiffs and class members. ............................................ 71 |
|  | G. | The Real Impact of Artificial Pricing .................................. 75 |
| VI. | | TOLLING OF THE STATUTE OF LIMITATIONS ................................ 78 |
|  | A. | Discovery Rule Tolling .................................................. 78 |
|  | B. | Fraudulent Concealment Tolling .......................................... 79 |
|  | C. | Estoppel ................................................................ 79 |
| VII. | | DIRECT DAMAGE SUSTAINED BY PLAINTIFFS ................................ 80 |
| VIII. | | CLASS ACTION ALLEGATIONS .............................................. 80 |
| IX. | | CLAIMS FOR RELIEF .................................................... 84 |
| COUNT ONE VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) (AGAINST LILLY) ................................................................ 84 |  |  |
|  | A. | Lilly is a culpable "persons" under RICO. ................................ 84 |
|  | B. | The Manufacturer-PBM RICO Enterprises .................................. 85 |
|  |  | 1. The Eli Lilly-PBM Enterprises: ...................................... 88 |
|  | C. | The Use of the U.S. Mails and Interstate Wire Facilities .................. 91 |
|  | D. | Conduct of the RICO Enterprises' Affairs ................................ 93 |

E.      Lilly's Pattern of Racketeering Activity ................................................ 95

F.      The Motive .............................................................................................. 97

G.      Damages Caused by the Scheme ............................................................ 97

COUNT TWO VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)  BY
          CONSPIRING TO VIOLATE 18 U.S.C. § 1962 ........................................... 99

FACTUAL ALLEGATIONS RELEVANT TO  COUNTS THREE THROUGH
          FIFTY-FIVE ............................................................................................ 102

COUNT THREE VIOLATION OF THE ALABAMA DECEPTIVE  TRADE
          PRACTICES ACT ALA. CODE § 8-19-1, *ET SEQ.* ...................................... 107

COUNT FOUR VIOLATION OF THE ALASKA UNFAIR TRADE
          PRACTICES AND CONSUMER PROTECTION ACT ALASKA STAT.
          § 45.50.471, *ET SEQ.*.............................................................................. 109

COUNT FIVE VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
          ARIZONA REV. STAT. § 44-1521, *ET SEQ.* ............................................ 110

COUNT SIX VIOLATION OF THE ARKANSAS  DECEPTIVE TRADE
          PRACTICES ACT ARK. CODE § 4-88-101 *ET SEQ.* .................................. 112

COUNT SEVEN VIOLATION OF THE CALIFORNIA LEGAL REMEDIES
          ACT CAL. CIV. CODE § 1750, *ET SEQ.* ................................................... 113

COUNT EIGHT VIOLATION OF THE CALIFORNIA UNFAIR
          COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*..................... 115

COUNT NINE VIOLATION OF THE COLORADO CONSUMER
          PROTECTION ACT COLO. REV. STAT. § 6-1-101, *ET SEQ.* .................................. 117

COUNT TEN VIOLATION OF THE CONNECTICUT UNFAIR TRADE
          PRACTICES ACT CONN. GEN. STAT. § 42-110A, *ET SEQ.* .................................. 119

COUNT ELEVEN VIOLATION OF THE DELAWARE CONSUMER FRAUD
          ACT DEL. CODE TIT. 6, § 2513, *ET SEQ.*................................................... 120

COUNT TWELVE VIOLATION OF THE D.C. CONSUMER PROTECTION
          PROCEDURES ACT D.C. CODE § 28-3901, *ET SEQ.*.................................. 121

COUNT THIRTEEN VIOLATION OF THE FLORIDA UNFAIR AND
          DECEPTIVE TRADE PRACTICES ACT FLA. STAT. § 501.201, *ET
          SEQ.* ...................................................................................................... 122

COUNT FOURTEEN VIOLATION OF THE GEORGIA FAIR BUSINESS
          PRACTICES ACT GA. CODE § 10-1-390, *ET SEQ.*.................................... 124

COUNT FIFTEEN VIOLATION OF THE GEORGIA UNIFORM  DECEPTIVE
TRADE PRACTICES ACT GA. CODE. ANN § 10-1-370, *ET SEQ.* .......................... 125

COUNT SIXTEEN VIOLATION OF THE HAWAII ACT § 480-2(A) HAW.
REV. STAT. § 480, *ET SEQ.* ....................................................................... 126

COUNT SEVENTEEN VIOLATION OF THE IDAHO CONSUMER
PROTECTION ACT IDAHO CODE § 48-601, *ET SEQ.* ............................... 127

COUNT EIGHTEEN VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT 815 ILL. COMP.
STAT. § 505/1, *ET SEQ.*, & § 295/1A ........................................................ 129

COUNT NINETEEN VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT IND. CODE § 24-5-0.5-3 .................................. 130

COUNT TWENTY VIOLATION OF THE IOWA PRIVATE RIGHT OF
ACTION FOR CONSUMER FRAUDS ACT IOWA CODE § 714H.1, *ET
SEQ.* ............................................................................................................ 132

COUNT TWENTY-ONE VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT KAN. STAT. § 50-623, *ET SEQ.* .................................. 133

COUNT TWENTY-TWO VIOLATION OF THE KENTUCKY CONSUMER
PROTECTION ACT KY. REV. STAT. § 367.110, *ET SEQ.* ......................... 134

COUNT TWENTY-THREE VIOLATION OF THE LOUISIANA UNFAIR
TRADE PRACTICES  AND CONSUMER PROTECTION LAW LA.
REV. STAT. § 51:1401, *ET SEQ.* .............................................................. 135

COUNT TWENTY-FOUR VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.* ...................... 136

COUNT TWENTY-FIVE VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT MD. CODE, COM. LAW § 13-101, *ET SEQ.* ............................ 137

COUNT TWENTY-SIX VIOLATION OF THE MASSACHUSETTS GENERAL
LAW CHAPTER 93(A) MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.* ...................... 138

COUNT TWENTY-SEVEN VIOLATION OF THE MICHIGAN CONSUMER
PROTECTION ACT MICH. COMP. LAWS § 445.903, *ET SEQ.* ............................. 140

COUNT TWENTY-EIGHT VIOLATION OF THE MINNESOTA
PREVENTION OF CONSUMER FRAUD ACT MINN. STAT. §
325F.68, *ET SEQ.* ........................................................................................ 141

COUNT TWENTY-NINE VIOLATION OF THE MINNESOTA DECEPTIVE
TRADE PRACTICES ACT MINN. STAT. § 325D.43-48, *ET SEQ.* ........................... 142

COUNT THIRTY VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT MISS. CODE. § 75-24-1, *ET SEQ.* ............................................... 143

COUNT THIRTY-ONE VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT MO. REV. STAT. § 407.010, *ET SEQ.* ........................................... 144

COUNT THIRTY-TWO VIOLATION OF THE MONTANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT OF 1973 MONT.
CODE ANN. § 30-14-101, *ET SEQ.* ............................................................... 145

COUNT THIRTY-THREE VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT NEB. REV. STAT. § 59-1601, *ET SEQ.* ....................................... 146

COUNT THIRTY-FOUR VIOLATION OF THE NEVADA DECEPTIVE
TRADE PRACTICES ACT NEV. REV. STAT. § 598.0903, *ET SEQ.* ......................... 147

COUNT THIRTY-FIVE VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT N.H. REV. STAT. § 358-A:1, *ET
SEQ.* ......................................................................................................... 148

COUNT THIRTY-SIX VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT N.J. STAT. ANN. § 56:8-1, *ET SEQ.* (AGAINST ELI
LILLY) ....................................................................................................... 149

COUNT THIRTY-SEVEN VIOLATION OF THE NEW MEXICO UNFAIR
TRADE PRACTICES ACT N.M. STAT. § 57-12-1, *ET SEQ.* ..................................... 152

COUNT THIRTY-EIGHT VIOLATION OF THE NEW YORK GENERAL
BUSINESS LAW  N.Y. GEN. BUS. LAW §§ 349-350 ............................................... 154

COUNT THIRTY-NINE VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE TRADE PRACTICES ACT N.C. GEN. STAT. § 75-
1.1, *ET SEQ.* .............................................................................................. 155

COUNT FORTY VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT N.D. CENT. CODE § 51-15-02 ........................................................ 156

COUNT FORTY-ONE VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, *ET SEQ.* ............................ 157

COUNT FORTY-TWO VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT OKLA. STAT. TIT. 15, § 751, *ET SEQ.* ..................................... 159

COUNT FORTY-THREE VIOLATION OF THE OREGON UNLAWFUL
TRADE PRACTICES ACT OR. REV. STAT. § 646.605, *ET SEQ.* ............................ 161

COUNT FORTY-FOUR VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES  AND CONSUMER PROTECTION LAW 73 PA.
CONS. STAT. § 201-1, *ET SEQ.* ................................................................... 162

COUNT FORTY-FIVE VIOLATION OF THE RHODE ISLAND UNFAIR
TRADE PRACTICES  AND CONSUMER PROTECTION ACT R.I.
GEN. LAWS § 6-13.1, *ET SEQ.* ................................................................. 164

COUNT FORTY-SIX VIOLATION OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT S.C. CODE ANN. § 39-5-10, *ET SEQ.* ........... 165

COUNT FORTY-SEVEN VIOLATION OF THE SOUTH DAKOTA
DECEPTIVE TRADE PRACTICES  AND CONSUMER PROTECTION
LAW S.D. CODIFIED LAWS § 37-24-6, *ET SEQ.* .................................... 166

COUNT FORTY-EIGHT VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.* .............. 167

COUNT FORTY-NINE VIOLATION OF THE TEXAS DECEPTIVE TRADE
PRACTICES CONSUMER PROTECTION ACT TEX. BUS. & COM.
CODE § 17.41, *ET SEQ.* ............................................................................ 168

COUNT FIFTY VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT UTAH CODE § 13-11-1, *ET SEQ.* ................................ 170

COUNT FIFTY-ONE VIOLATION OF THE VERMONT CONSUMER FRAUD
ACT VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.* .......................................... 171

COUNT FIFTY-TWO VIOLATION OF THE VIRGINIA CONSUMER
PROTECTION ACT VA. CODE ANN. §§ 59.1-196, ET SEQ. ..................... 172

COUNT FIFTY-THREE VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT REV. CODE WASH. § 19.86.010, *ET SEQ.* .............. 173

COUNT FIFTY-FOUR VIOLATION OF THE WEST VIRGINIA CONSUMER
CREDIT  AND PROTECTION ACT W. VA. CODE § 46A-1-101, *ET
SEQ.* ............................................................................................................ 174

COUNT FIFTY-FIVE VIOLATION OF THE WISCONSIN  DECEPTIVE
TRADE PRACTICES ACT WIS. STAT. § 110.18 ........................................ 176

COUNT FIFTY-SIX VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT WYO. STAT. §§ 40-12-105 *ET SEQ.* ........................ 177

DEMAND FOR JUDGMENT ................................................................................ 179

JURY DEMAND .................................................................................................. 179

- viii -

Plaintiffs, on behalf of themselves and all others similarly situated, for their complaint against defendant Eli Lilly and Company ("Lilly") allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief as follows:

## I.      INTRODUCTION

1.      Plaintiffs, consumers of analog insulin, bring this proposed class action against one of the manufacturers of insulin—Eli Lilly—for its artificial and fraudulent inflation of the benchmark price of its analog insulin, Humalog, in the United States.

2.      For over a decade, Insulin Drug Manufacturers Lilly, Novo Nordisk and Sanofi[1] have conspired with the largest pharmacy benefit managers (PBMs)—to widen a secret spread between the manufacturers' published, inflated, and misleading benchmark prices, and their undisclosed, net selling prices for their analog insulins. Cognizant that PBM profits are tied to the size of the spread between benchmark and actual net selling prices, the manufacturers have engaged in an arms race of increasing their spreads by artificially inflating benchmark prices while secretly holding net prices constant. This benchmark price inflation pads the pockets of PBMs, who retain a percentage of the spreads between benchmark and net price. To carry out this scheme, the Insulin Drug Manufacturers (Lilly, Novo Nordisk, and Sanofi) publicly reporting one price—the benchmark or "sticker" price—for their analog insulins while secretly offering a far lower price—the net price—to the largest PBMs. In exchange for the manufacturers' inflation of their benchmark prices (and corresponding spreads between prices), the PBMs promise preferred formulary placement to the winning bidder, *i.e.*, the manufacturer

---

[1] Lilly, Novo Nordisk, and Sanofi were all named as defendants in *In re Insulin Pricing Litigation*, No 17 699 (BRM) (LHG) (D.N.J.). Lilly raised personal jurisdiction arguments in a motion to dismiss in that case. In response, plaintiffs file claims against Lilly in this Court where Lilly engaged in unlawful acts with CVS. An amended complaint against Novo Nordisk and Sanofi has been filed in New Jersey.

with the highest spread. As a result, formulary decisions for these important medications are increasingly made based on inflated benchmark prices (and corresponding spread inflation), rather than the net prices or safety and efficacy of the analog insulins.

3.      Caught in the middle of this price-inflation gamesmanship are consumers who pay for analog insulin based on benchmark prices at the point of sale. The scheme deceived the plaintiffs and class members. Rather than pay for their analog insulins based on a true benchmark price—a reasonable approximation of the analog insulins' real prices (upon which their payments are based), they instead paid for their analog insulins at the point of sale based on a manipulated number that has little or no relationship to the true price of the drug. All consumer payers, such as the plaintiffs, relied on Lilly's representation that its Humalog benchmark prices were reasonable benchmark prices for making significant, out-of-pocket payments for Humalog.

4.      PBMs are middlemen between health insurers, pharmacies, and drug manufacturers: they negotiate directly with drug manufacturers on behalf of health insurers to determine the prices those insurers will pay for the manufacturers' drugs. Drug manufacturers and PBMs negotiate these price discounts in the form of "rebates": after a consumer purchases a drug, the drug manufacturer will pay back to the PBM a portion of that drug's cost (the rebate). The PBM will then give a portion of that rebate to their health insurer client. The nation's most influential PBMs—CVS Health, Express Scripts, and OptumRx—together cover over 80% of the insured market: in total, 180 million lives.

5.      Where two or more branded medicines fall into the same therapeutic category and have similar effectiveness and safety profiles (as is the case with the analog insulins), a PBM is in the position to sometimes exclude, or place in a non-preferred position, one of the medications in the place of another. When a drug is excluded from formulary or placed in a non-preferred

- 2 -

position, health insurers using that formulary will pay for fewer or none of the units of the disadvantaged product. As a result, in the branded analog insulin therapeutic category, the large PBMs can push significant portions of the sales toward or way from the Insulin Drug Manufacturers' products.

6.      Ostensibly, PBMs in such a positions might negotiate real price discounts from drug manufacturers. In other words, the PBMs might negotiate discounts or rebates that lower the manufacturers' *net* selling prices and then to use those reductions as legitimate bases to confer formulary status to the least costly medication. The legitimate use of discounts and rebates that actually reduce the manufacturers' net selling prices (and its accompanying benchmark prices) is not at issue in this case.

7.      PBMs make money by pocketing a percentage of the difference between a drug's benchmark price and the net price they negotiate with its manufacturer, *i.e.* the "spread" between prices. PBMs that operate mail order or retail pharmacies also make money by charging consumers, at the point of sale, based on benchmark prices, while paying net pricing for the drugs themselves. Simply put, the larger the spreads between a drug's benchmark and net prices, the larger the PBMs' profits.

8.      In the last five years alone, Novo Nordisk, Eli Lilly, and Sanofi have raised their benchmark prices by over 150%. Benchmark prices that used to be $75 a decade ago are now between $300 and $600. And nothing about the Insulin Drug Manufacturers' analog insulins has *changed* in that period; the $300 drug is the exact same one they sold for $75 years ago. And the Insulin Drug Manufacturers have raised their benchmark prices in perfect lockstep.

**Figure 1: Insulin Drug Manufacturers increase long-acting insulin benchmark prices in lock-step.**



- 4 -

**Figure 2: Insulin Drug Manufacturers increase rapid-acting insulin benchmark prices in lock-step.**



9.     An arms race in the escalation of reported benchmark prices—and consequently spreads—has ensued between the Insulin Drug Manufacturers. Each Insulin Drug Manufacturer has incrementally raised its benchmark prices just a bit more than its competitors, encouraging the large PBMs to keep its insulin drugs on the formulary or in a preferred formulary position. Yet, at the same time, the manufacturers' net selling prices have generally remained level, and certainly have not increased at a rate even close to that of the inflated benchmark prices.  In short, the Insulin Drug Manufacturers have sold to the PBMs fictitious paper spread between inflated benchmark prices and net selling prices.

10.     This benchmark price inflation has a victim: consumers who pay for their drugs based on benchmark prices. The plaintiffs and class members are people living with diabetes

- 5 -

who pay for their insulin based on benchmark prices: uninsured patients, patients in high-deductible health plans, patients in Medicare Part D plans who fall into the Medicare Part D Coverage Gap, and patients with high co-insurance obligations. These plaintiffs' out-of-pocket expenditures at the point of sale are based on the insulins' benchmark price. In other words, when a plaintiff goes to a pharmacy (or uses a mail order service) to pick up her analog insulin, the charge she incurs is based on the analog insulin's *benchmark* price, not the medicine's *net* price.[2] The price reductions the drug manufacturers offer PBMs *are not reflected in price tags the consumers see*. And the larger the benchmark price, the larger the plaintiff's out-of-pocket payment.

11.     Lilly's publication of Humalog's benchmark price, while concealing its net price, has deceived the plaintiffs into believing that the benchmark price on which their out-of-pocket payments based is a reasonable and fair approximation of the actual cost of Humalog. Lilly publicly represents that the benchmark price of Humalog is just that—a *benchmark* price; a *reasonable approximation* of the cost of Humalog and a *reasonable basis* for consumer out-of-pocket payments. Thus, by publicizing the benchmark price, while maintaining the net price confidential, Lilly has deceived the plaintiffs and class members into making out-of-pocket payments for Humalog that are grossly inflated.

12.     The reason that Lilly published the Humalog benchmark price, while concealing the net price, is so that the PBMs and health insurers could *use* the benchmark price as a basis for consumer cost-sharing. The publication of the benchmark price is the basis for the *quid pro quo* with the PBMs. If consumers did not understand benchmark price as reasonable approximation

---

[2] If the consumer is uninsured, the pharmacy offers the consumer a "usual and customary rate" also based on benchmark price.

of the cost of Humalog—as reasonable basis for their cost-sharing obligations—PBMs and health insurers would not be able to use the benchmark price as a basis for consumer cost-sharing. If the PBMs could not use the benchmark price as a basis for reimbursement, the spread between benchmark and net price would evaporate. Without a spread to sell, Lilly would have nothing to offer PBMs in exchange for preferred formulary status except lower real prices or a better product. The scheme at issue allowed Lilly to increase its sales while keeping net price constant and was effectuated through consumer deception as to benchmark price.

13.     In a similar case, drug manufacturers "repeatedly asserted that they had no duty to disclose what was publicly known to everyone, that is, that the [drug's benchmark price] was a 'sticker price' and never intended to reflect the drug's true average wholesale price."[3] But the district court saw through this argument: "There is a difference between a sticker price and a sucker price. . . . The [plaintiffs] . . . have it exactly right: '[I]f everything [about the drug] was known to everybody, why did [d]efendants emphasize secrecy?'"[4] That the drug manufacturers were not the ones directly determining consumer cost-sharing obligations did not matter. As the court explained, the "defendants trumpeted a lie by publishing the inflated [benchmark prices], knowing (*and intending*) them to be used as instruments of fraud."[5] In this case, plaintiffs do not allege legitimate rebates but rather discounts that do not lower the manufacturer net selling price and are simply a *quid pro quo* for formulary placement. Further, in this complaint plaintiffs are not trying to criminalize any lawful aspect of pricing or rebates. Rather, plaintiffs complain that Lilly has unlawfully created a fictitious widening spread between inflated benchmark prices and

---

[3] *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003).

[4] *Id.*

[5] *Id.* at 167.

actual net sales prices. This challenge is essentially no different than the successful challenges to

benchmark prices in the *Lupron*, *Average Wholesale Price,* and *McKesson* litigations.

14.     If the Insulin Drug Manufacturers had set their benchmark prices such that they

were reasonable approximations of the analog insulins' true costs, the plaintiffs and class

members would have paid much less out-of-pocket for their analog insulins. But, instead, Lilly

chose to exponentially inflate its benchmark prices, while concealing from the plaintiffs the

reality that its net prices were much lower. The plaintiffs relied on Lilly's representations

regarding its benchmark prices and paid for its analog insulins based on these artificially inflated

benchmark prices to their detriment.

15.     As a result of the Insulin Drug Manufacturers' deceptive, unfair, and

unconscionable conduct, the plaintiffs and members of the class have overpaid for their analog

insulins when they paid for these medications based on their benchmark prices. The amount they

have overpaid is the difference between the drugs' point-of-sale prices and a reasonable

approximation of the drugs' net prices.

16.     The physical, emotional, and financial tolls of paying such excessive prices for

insulin on the plaintiffs and class members is devastating. Unable to afford their insulin drugs,

plaintiffs report under-dosing their insulin, injecting expired insulin, re-using needles, and

starving themselves to control their blood sugars with as little insulin as possible. These

behaviors are dangerous for people living with diabetes. Because such behaviors ineffectively

control those individuals' blood sugar levels, they can lead to serious complications such as

kidney failure, heart disease, blindness, infection, and amputations. Uninsured and unable to

afford the analog insulin their doctors prescribed, multiple plaintiffs have lost their vision and

kidneys. Other plaintiffs have been rushed to emergency rooms because they were unable to

- 8 -

afford enough analog insulin to control their blood sugars and developed diabetic ketoacidosis. To cut down on costs, many class members re-use needles and pen tips, a dangerous practice that can lead to infection. Other class members explain that they avoid the doctor because their inability to afford insulin has caused their blood sugars to spike. They know that their doctors will prescribe more analog insulin to treat this problem, and they simply cannot afford to take any more analog insulin. Plaintiffs describe how the amount they spend on analog insulin makes it impossible for them to maintain the healthy diet that people living with diabetes need, further compromising their health. Thus, while the purpose of analog insulin is to improve the health of those living with diabetes, the rising and excessive cost of these drugs is actually forcing the plaintiffs to jeopardize their health.

17.     The financial strain of these excessive analog insulin prices infects all areas of the plaintiffs' lives. Stories of diabetics taking out loans and accruing debt to afford insulin are common. Multiple people living with diabetes estimate that they spend over 50% of their monthly income on analog insulin medications. Some patients have been unable to leave bad jobs for fear of losing their health insurance; others have been encouraged to leave good jobs for positions that might pay more or have better insurance. Many diabetics describe rearranging their lives around their analog insulin costs—keeping lights off and the heat low to avoid high electricity bills, moving back in with parents, and leaving school. Many parents of children with diabetes have had to make hard choices regarding their children's futures: pre-Kindergarten schooling or insulin? As one person put it, "[f]inancially, it's killing me."

18.     The financial hardships the price hikes impose on those living with diabetes also have serious mental health consequences. Many patients describe the constant stress and anxiety that accompanies not knowing how they will pay for next month's analog insulin supply. "I often

- 9 -

cry, and I think, have I done something wrong that I can't afford to take care of myself?" Others express anger and a deep sense of betrayal that a once-affordable drug is now completely unaffordable. "I feel so taken advantage of; now, I can't afford my medications, and for what? All so some drug company can profit from my sickness?" In short, a medication that should be a source of health has instead become a cause of pain.

19. This action alleges that Lilly violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and various state consumer protection laws by artificially inflating and manipulating the benchmark price of Humalog. This scheme directly and foreseeably caused and continues to cause consumers to overpay for the insulin they need.

## II.     PARTIES

### A.     Plaintiffs

#### 1.     Arizona Plaintiffs.

##### a.     F. Donald Fellow.

20. Plaintiff F. Donald Fellow is a citizen of the State of Arizona and resides in Phoenix, Arizona.

21. Mr. Fellow has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

##### b.     Michelle Gwin.

22. Plaintiff Michelle Gwin is a citizen of the State of Arizona and resides in Prescott Valley, Arizona.

23. Ms. Gwin used to purchase insulin on behalf of her adult sons, Taylor and Alex Gwin. She purchased insulin for Taylor until March 31, 2017, and purchased insulin for Alex

until 2012. Both Alex and Taylor have type 1 diabetes and take Humalog brand insulin to treat their diabetes. Ms. Gwin has a high-deductible health plan and pays for insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog.

### c. Ruth Hart.

24.     Plaintiff Ruth Hart is a citizen of the State of Arizona and resides in Mesa, Arizona.

25.     Ms. Hart has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. In the past, she took Novolog. Between May 2013 and April 2015, Ms. Hart was insured through her employer and enrolled in an employee welfare benefit health plan. Beginning in June 2015 through August 2017, she worked for a different employer and enrolled in that company's employee welfare benefit health plan. Under the terms of that plan, she made high coinsurance payments for her insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog.

### 2. California Plaintiffs.

### a. Jeanne MacNitt.

26.     Plaintiff Jeanne MacNitt is a citizen of the State of California and resides in Sonora, California.

27.     Ms. MacNitt has type 2 diabetes, and she currently takes Lantus and Novolog brand insulin to treat her diabetes. She used to take Lantus and Humalog. She is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price. As a direct result of the scheme, she has overpaid for Novolog, Lantus, and Humalog.

- 11 -

b.      **Juliana Patton.**

28.      Plaintiff Juliana Patton is a citizen of the State of California and resides in Fresno,

California.

29.      Ms. Patton purchases insulin for her minor daughter, Alexa Patton, who has type

1 diabetes. In January 2017, Ms. Patton began to purchase Novolog brand insulin for her

daughter. Prior to that, she purchased Apidra and Humalog brand insulin. Ms. Patton is insured

in a high-deductible health plan and pays for her insulin based on benchmark price. As a direct

result of the scheme, she has overpaid for Novolog, Apidra, and Humalog.

c.      **Mark Schloemer.**

30.      Plaintiff Mark Schloemer is a citizen of the State of California and resides in

Corona, California.

31.      Mr. Schloemer purchased insulin for his adult son, Luke, who has type 1 diabetes.

Luke has taken Humalog and Novolog brand insulin to treat his diabetes. Mr. Schloemer paid for

these purchases under his GEHA health plan, which has a high-deductible and coinsurance

requirement. He was paying for his son's insulin based on benchmark prices. As a direct result of

the scheme, he has overpaid for Humalog and Novolog.

**3.      Colorado Plaintiff.**

a.      **Donald Douthit.**

32.      Plaintiff Donald Douthit is a citizen of the State of Colorado and resides in

Woodland Park, Colorado.

33.      Mr. Douthit has type 2 diabetes, and he currently takes Lantus and Humalog

brand insulin to treat his diabetes. He is insured under Medicare Part D and consistently reaches

the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based

on benchmark price. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

### 4. Florida Plaintiffs.

#### a. Sean Mac an Airchinnigh.

34.    Plaintiff Sean Mac an Airchinnigh is a citizen of the State of Florida and resides in Ave Maria, Florida.

35.    Mr. Airchinnigh has type 1 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured through Medicare Part D and hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Lantus and Humalog.

#### b. Edward Johnson.

36.    Plaintiff Edward Johnson is a citizen of the State of Florida and resides in Ponte Vedra, Florida.

37.    Mr. Johnson has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

#### c. Anne Olinger.

38.    Plaintiff Anne Olinger is a citizen of the State of Florida and resides in Naples, Florida.

39.    Ms. Olinger purchases insulin for her 20-year-old adult child and has been since he was 12 years old. He has type 1 diabetes. In spring 2017, Ms. Olinger began to purchase Novolog brand insulin for him. In the past, she has purchased Levemir and Humalog brand

- 13 -

insulin. She has a high deductible plan and must pay for insulin based on benchmark prices. As a direct result of the scheme, she has overpaid for Levemir, Novolog, and Humalog.

> **d.     Howard Schurr**

40.     Plaintiff Howard Schurr is a citizen of the State of Florida and resides in Boca Raton, Florida.

41.     Mr. Schurr has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Lantus and Humalog.

> **e.     Tremayne Sirmons.**

42.     Plaintiff Tremayne Sirmons is a citizen of the State of Florida and resides in Winter Park, Florida.

43.     Mr. Sirmons has type 1 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. He is insured in a high-deductible health plan and pays for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

> **f.     Hector J. Valdes, Sr.**

44.     Plaintiff Hector J. Valdes, Sr. is a citizen of the State of Florida and resides in Miami, Florida.

45.     Mr. Valdes, Sr. has type 2 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He is insured through AARP and Medicare parts A, B and D. He consistently hits the Medicare part D "Donut Hole" where he must pay 40% of the cost of his insulin drug, based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

- 14 -

5.      **Georgia Plaintiffs.**

        a.      **Marilyn Person.**

46.      Plaintiff Marilyn Person is a citizen of the State of Georgia and resides in Villa

Rica, Georgia.

47.      Ms. Person has type 2 diabetes, and she currently takes Levemir and Humalog

brand insulin to treat her diabetes. She was previously taking Novolog brand insulin. She is

insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole." She

sometimes obtains samples when she cannot afford her prescribed insulin medications. As a

direct result of the scheme, she has overpaid for Levemir, Novolog, and Humalog.

        b.      **Karyn Wofford.**

48.      Plaintiff Karyn Wofford is a citizen of the State of Georgia and resides in

Jackson, Georgia.

49.      Ms. Wofford has type 1 diabetes, and she currently takes Lantus and Humalog

brand insulin to treat her diabetes. She is insured through the Georgia Healthcare Marketplace in

a high-deductible health plan. She started this plan in January and cannot afford to hit her

deductible. She is unsure what she will do when she can no longer afford her insulin. As a direct

result of the scheme, she has overpaid for both Lantus and Humalog.

6.      **Idaho Plaintiff.**

        a.      **Emma Jensen.**

50.      Plaintiff Emma Jensen is a citizen of the State of Idaho and resides in Meridian,

Idaho.

51.      Ms. Jensen has type 1 diabetes, and she currently takes Humalog brand insulin to

treat her diabetes. Previously, she purchased several different insulin brands, including Novolog

and/or Lantus. During the class period, she was uninsured and paid for her insulin out-of-pocket

- 15 -

based on benchmark prices. As a direct result of the scheme, she has overpaid for Humalog, Novolog, and/or Lantus.

**7.      Iowa Plaintiff.**

**a.      Richard Knauss.**

52.      Plaintiff Richard Knauss is a citizen of the State of Iowa and resides in Madrid, Iowa.

53.      Mr. Knauss has type 1 diabetes, and he currently takes Lantus and Novolog brand insulin to treat his diabetes. He recently switched to Novolog from Humalog brand insulin. He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Lantus, Novolog, and Humalog.

**8.      Louisiana Plaintiff.**

**a.      Robyn Rushing.**

54.      Plaintiff Robyn Rushing is a citizen of the State of Louisiana and resides in Winnsboro, Louisiana.

55.      Ms. Rushing has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. She previously took Levemir and Novolog brand insulin. In November 2016, she enrolled in Medicaid. She now pays $3 per bottle for insulin. However, she was previously uninsured and paid for her insulin out-of-pocket based on benchmark price. As a direct result of the scheme, she has overpaid for Humalog, Novolog, and Levemir.

**9.      Maine Plaintiff.**

**a.      Molly Thompson.**

56.      Plaintiff Molly Thompson is a citizen of the State of Maine and resides in Portland, Maine.

- 16 -

57.     Ms. Thompson has type 1 diabetes, and she currently takes Humalog brand insulin to treat her diabetes. In the past, she took Levemir brand insulin. She switched insurance in January 2017 to a high deductible plan. Prior to January 2017, she was enrolled in a different high-deductible plan and paid for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for both Levemir and Humalog.

**10.     Maryland Plaintiff.**

  **a.     Brian Phair.**

58.     Plaintiff Brian Phair is a citizen of the State of Maryland and resides in North Bethesda, Maryland.

59.     Mr. Phair has type 1 diabetes, and he currently takes Novolog brand insulin to treat his diabetes. He was previously taking Humalog brand insulin. He is insured in a high deductible health plan and must pay out-of-pocket, based on benchmark prices, before he meets his deductible. As a direct result of the scheme, he has overpaid for Novolog and Humalog.

**11.     Massachusetts Plaintiffs.**

  **a.     Gerald Girard.**

60.     Plaintiff Gerald Girard is a citizen of the Commonwealth of Massachusetts and resides in Fairhaven, Massachusetts.

61.     Mr. Girard has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. In the past, he has taken Novolog brand insulin. He is insured under Medicare Part D and has high out-of-pocket costs due to benchmark prices. As a direct result of the scheme, he has overpaid for Novolog, Lantus, and Humalog.

### 12. Michigan Plaintiffs.

#### a. Susan Landis.

62.     Plaintiff Susan Landis is a citizen of the State of Michigan and resides in Taylor,

Michigan.

63.     Ms. Landis has type 1 diabetes, and she currently takes Lantus and Novolog brand

insulin to treat her diabetes. In the past, she took Humalog. She is insured under Medicare Part D

and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost

of her insulin drugs, based on benchmark price. As a direct result of the scheme, she has

overpaid for Lantus, Novolog, and Humalog.

#### b. Patricia Quint.

64.     Plaintiff Patricia Quint is a citizen of the State of Michigan and resides in

Rochester Hills, Michigan.

65.     Ms. Quint has type 1 diabetes, and she currently takes Humalog, Humulin R, and

Humulin N brand insulin to treat her diabetes. She is insured through Medicare Part D and

consistently hits the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her

insulin drugs, based on benchmark price. As a direct result of the scheme, she has overpaid for

Humalog.

### 13. Minnesota Plaintiff.

#### a. Jon Ugland.

66.     Plaintiff Jon Ugland is a citizen of the State of Minnesota and resides in Byron,

Minnesota.

67.     Mr. Ugland has type 1 diabetes, and he currently takes Humalog brand insulin to

treat his diabetes. In the past, he took Lantus and Novolog brand insulin. He is insured through

Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay

40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog, Lantus and Novolog.

**14.     Missouri Plaintiff.**

**a.     Aletha Bentele.**

68.     Plaintiff Aletha Bentele is a citizen of the State of Missouri and resides in Independence, Missouri.

69.     Ms. Bentele has type 1 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes. She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus and Humalog.

**15.     Montana Plaintiffs.**

**a.     James Bonser.**

70.     Plaintiff James Bonser is a citizen of the State of Montana and resides in Bigfork, Montana.

71.     Mr. Bonser has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and often reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

**b.     Gay Deputee.**

72.     Plaintiff Gay Deputee is a citizen of the State of Montana and resides in Hardin, Montana.

73.     Ms. Deputee has type 2 diabetes, and she currently takes Lantus and Humalog brand insulin to treat her diabetes. In the past, she has taken Novolog and Levemir. She is

- 19 -

insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% of the cost of her insulin drugs, based on benchmark price. As a direct result of the scheme, she has overpaid for both Lantus and Humalog.

**16.    Nebraska Plaintiff.**

      **a.    John Loschen.**

74.    Plaintiff John Loschen is a citizen of the State of Nebraska and resides in Holdrege, Nebraska.

75.    Mr. Loschen has type 1 diabetes, and he currently takes Levemir and Novolog brand insulin to treat his diabetes. In the past, he took Lantus and Humalog brand insulin. He is insured in a high deductible health plan and pays for his insulin based on benchmark prices. As a direct result of the scheme, he has overpaid for Lantus, Levemir, Humalog, and Novolog.

**17.    Nevada Plaintiffs.**

      **a.    Marie Saffran.**

76.    Plaintiff Marie Saffran is a citizen of the State of Nevada and resides in Henderson, Nevada. She moved to Nevada from Indiana in September 2016.

77.    Ms. Saffran has type 2 diabetes, and she currently takes Humalog and Basaglar brand insulin to treat her diabetes. She previously took Lantus brand insulin. When she moved to Nevada, she enrolled in Medicaid. Her insulin is now affordable. However, she was previously insured in a high-deductible health plan and paid for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus and Humalog.

**18.    New Jersey Plaintiffs.**

      **a.    David Hernandez.**

78.    Plaintiff David Hernandez is a citizen of the State of New Jersey and resides in Paterson, New Jersey.

- 20 -

79.     Mr. Hernandez has type 1 diabetes, and he currently takes Humalog and Lantus brand insulin to treat his diabetes. He currently receives pharmaceutical coverage under the New Jersey Pharmaceutical Assistance to the Aged and Disabled Program. However, until 2014, he was uninsured or had sporadic coverage. During that time, he could not afford his insulin. As a result, his blood sugar levels caused severe damage to his eyes and kidneys. He is now blind in one eye and has had a kidney transplant due to his inability to afford insulin and control his type 1 diabetes. As a direct result of the scheme, he has overpaid for both Humalog and Lantus.

**b.      Lawrence Mandel.**

80.     Plaintiff Lawrence Mandel is a citizen of the State of New Jersey and resides in West Orange, New Jersey.

81.     Mr. Mandel has type 1 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He occasionally buys Levemir instead of Lantus depending on the drugs' prices. He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for Lantus, Levemir, and Humalog.

**19.    New York Plaintiffs.**

**a.      Robert Lowman.**

82.     Plaintiff Robert Lowman is a citizen of the State of New York and resides in Buffalo, New York.

83.     Mr. Lowman has type 1 diabetes, and he currently takes Humalog and Basaglar brand insulin to treat his diabetes. In the past, he took Novolog, Levemir, and Lantus brand insulin, as well. He is currently uninsured for between a third and half of the year due to the seasonal nature of his employment. During the months he was uninsured last year, he had very

- 21 -

high out-of-pocket costs due to benchmark prices. As a direct result of the scheme, he has overpaid for Lantus, Levemir, Humalog, and Novolog.

      **20.**    **Texas Plaintiff.**

          **a.**    **Bret Stewart.**

84.     Plaintiff Bret Stewart is a citizen of the State of Texas and resides in Dalhart, Texas.

85.     Mr. Stewart has type 1 diabetes, and he currently takes Novolin R and Novolin N brand insulin to treat his diabetes. In the past, he took Humalog, Lantus, Apidra, and Toujeo. He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark prices. As a direct result of the scheme, he has overpaid for Humalog, Lantus, Apidra, and Toujeo.

      **21.**    **Utah Plaintiffs.**

          **a.**    **Scott Christensen.**

86.     Plaintiff Scott Christensen is a citizen of the State of Utah and resides in Payson, Utah.

87.     Mr. Christensen has type 1 diabetes, and he currently takes Novolog and Humalog brand insulin to treat his diabetes. For a portion of 2016, Mr. Christensen's insurance provider did not cover his insulin medication, and he was forced to pay for his insulin medications out-of-pocket based on benchmark price. As a direct result of the scheme, Mr. Christensen overpaid for his Novolog and Humalog.

          **b.**    **Dianna Gilmore.**

88.     Plaintiff Dianna Gilmore is a citizen of the State of Utah and resides in Spanish Fork, Utah.

- 22 -

89.     Ms. Gilmore has type 2 diabetes, and she currently takes Novolog brand insulin to treat her diabetes. In the past, she has taken Lantus, Levemir, and Humalog. Ms. Gilmore is uninsured and has paid out-of-pocket for her insulin based on benchmark price. As a direct result of the scheme, she has overpaid for Lantus, Levemir, Novolog and Humalog.

**22.     Washington Plaintiff.**

      **a.     Edward Stanford.**

90.     Plaintiff Edward Stanford is a citizen of the State of Washington and resides in Olympia, Washington.

91.     Mr. Stanford has type 1 diabetes, and he currently takes Humalog brand insulin to treat his diabetes. He has a high-deductible health plan and coinsurance requirement and pays for his insulin based on benchmark price. As a direct result of the scheme, he has overpaid for Humalog.

**23.     Wisconsin Plaintiffs.**

      **a.     Scott Dercks.**

92.     Plaintiff Scott Dercks is a citizen of the State of Wisconsin and resides in Milwaukee, Wisconsin.

93.     Mr. Dercks has type 2 diabetes, and he currently takes Lantus and Humalog brand insulin to treat his diabetes. He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

      **b.     Angela Kritselis.**

94.     Plaintiff Angela Kritselis is a citizen of the State of Wisconsin and resides in Grafton, Wisconsin.

- 23 -

95.     Ms. Kritselis has type 1 diabetes, and she currently takes Lantus and Humalog. In the past, she has also taken Novolog. Ms. Kritselis was uninsured until October 2017. During the class period, Ms. Kritselis paid for Lantus and Humalog out-of-pocket based on benchmark prices. Her health savings account is dwindling away due to the high cost of insulin. As a direct result of the scheme, she has overpaid for Lantus and Humalog.

      **c.      Michael Starr.**

96.     Plaintiff Michael Starr is a citizen of the State of Wisconsin and resides in Pleasant Prairie, Wisconsin.

97.     Mr. Starr has type 2 diabetes, and he currently takes Levemir and Humalog brand insulin to treat his diabetes. He is insured through Medicare Part D and consistently hits the Medicare Part D "Donut Hole" where he must pay 40% of the cost of his insulin drugs, based on benchmark price. As a direct result of the scheme, he has overpaid for both Levemir and Humalog.

98.     Certain plaintiffs regard their condition and payment issues as personal information and hence are suing as "Jane Doe" or "John Doe." Upon entry of a protective order in this case, they will disclose their names to defendants.

99.     On information and belief, each plaintiff paid out-of-pocket for insulin and that payment was based on the artificially inflated benchmark price. As a result, each plaintiff has been injured.

**B.      Defendant**

100.    Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog, which is used for the treatment of

- 24 -

diabetes. Lilly's revenues from Humalog in 2016 were $2.84 billion. Its revenues from Humalog

were $1.5 billion in 2013 and $1.7 billion in 2015.

## C.    Unnamed Insulin Manufacturers

101.    Sanofi-Aventis U.S. LLC (Sanofi) is a Delaware limited liability corporation with

a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi

manufactures Lantus, which is used for the treatment of diabetes. Sanofi's revenues from Lantus

were $6.98 billion in 2016 and over $4 billion in each year since 2013. Sanofi's SEC Form 20-F

for the year 2015 notes that "Lantus is particularly important; it was the Group's leading product

. . . representing 17.2% of . . . net sales . . . ."

102.    Novo Nordisk Inc. ("Novo) is a Delaware corporation and has a principal place of

business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536. Novo Nordisk manufactures

Novolog and Levemir, which are used for the treatment of diabetes. Novo Nordisk's revenues

from the sale of Novolog were $3.03 billion in 2016 and over $2 billion in 2014 and 2015.

Revenues from Levemir were $955 million in 2013, $1.3 billion in 2014, and $1.3 billion in

2015. Sales to diabetic patients are such a critical part of Novo Nordisk's business that its 2015

Annual Report's cover page stated in bold letters, "*Why Do So Many People in Cities Get*

*Diabetes?*"

## III.    JURISDICTION AND VENUE

103.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

the plaintiffs' claims arise under federal law and under 18 U.S.C. § 1964(c): this action alleges

violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This

Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts

with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or

value of $5,000,000, exclusive of interests and costs, and is a class action in which any member

- 25 -

of a class of plaintiffs is a citizen of a state different from any defendant. Finally, this Court has supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

104.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Lilly transacts business in, is found in, and/or has agents in the District of Rhode Island, and because some of the actions giving rise to this complaint took place within this district. In particular, Lilly effectuated the unlawful acts at issue by conducting business in this state with CVS.

105.    The Court has personal jurisdiction over Lilly. Lilly has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    Entities Involved in Drug Pricing

106.    The prescription drug industry consists of an opaque network of entities engaged in multiple distribution and payment structures. These entities include pharmaceutical companies, wholesalers, pharmacies, health benefit providers (institutional insurers, self-insured employers, health and welfare plans), pharmacy benefit managers, and patient-consumers.

107.    ***Pharmaceutical Companies***. Pharmaceutical companies (also known as drug companies or drug manufacturers) own the rights to manufacture and market drugs. This remains true even if these companies contract out the actual production of their drugs. Pharmaceutical companies typically own or contract with facilities that manufacture drugs and then sell their products to wholesalers. The defendant here is a pharmaceutical company.

- 26 -

108.     *Wholesalers*. After production, many manufacturers send their drugs to FDA-registered drug wholesalers for further distribution. Wholesalers purchase, inventory, and sell pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals, and clinics.

109.     *Health benefit providers*. Health benefit providers include institutional insurers, self-insured employers, and health and welfare plans. These plans submit payments on behalf of insured individuals to health care providers for services rendered to those individuals. Health insurers also cover a portion of their beneficiaries' drugs costs, submitting payments to pharmacies on behalf of their members. The term "health insurers" covers self-insured businesses, insurance companies, including those that participate in Medicaid and Medicare, and union-run health plans.

110.     *Pharmacy Benefit Managers*. Pharmacy benefit managers (PBMs) act as middlemen between drug manufacturers, pharmacies, and health insurers. In this role, PBMs perform a variety of services on behalf of their health insurer clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, construction of retail pharmacy networks for insurers, and provision of mail-order services. Nonetheless, they generally are not a direct link in the physical supply chain for pharmaceutical products because, in most instances, they do not take possession or control of prescription drugs. The largest PBMs are CVS Health, Express Scripts, and OptumRx. Together, they cover roughly 80 to 85 percent of privately insured Americans.

**B.     The Drug Payment & Distribution Structure**

111.     *Distribution*. Generally speaking, for retail pharmacy channels, branded prescription drugs are distributed from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer to patient.

- 27 -

112.  ***Downstream charges***. The downstream charges are from manufacturer to wholesaler, wholesaler to retailer (or mail order), and retailer (or mail order) to the health benefit providers (in the form of ingredient cost reimbursement and dispensing fees) and consumers (in the form of coinsurance, copayment, deductible payment, or cash).

113.  ***Upstream charges***. The upstream charges are from health benefit providers and/or PBM directly back to the manufacturer. These upstream charges are price discounts the Insulin Drug Manufacturers offer PBMs and their health insurer clients in the form of rebates. They typically occur well after the point-of-sale transactions.

114.  The figure below illustrates this payment structure. This figure labels certain payments "payment" and others "negotiated payment." The term "payment" refers to individual payments, made at the time of delivery; for example, when a patient walks into a pharmacy and picks up her prescription. At that moment, her health plan also pays a service fee to its PBM for dispensing the drug through its network of retail pharmacies. In contrast, a "negotiated payment" is a payment made under a negotiated contract. For example, a PBM might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for a period of time. The figure also indicates the flow of products and rebates.

**Figure 3: The U.S. drug payment structure[6]**



115.    When an insured consumer buys a medication from a pharmacy (a retailer), her insurer pays the pharmacy based on the price its PBM negotiated for that medication (the net price). In addition to her insurer's payment, the patient usually pays her pharmacy a portion of her medication's cost, out-of-pocket. Importantly, the patient's payment is based on the medication's *benchmark* price, whereas her insurer's payment is ultimately based on the *net* price her PBM negotiated.

116.    Insurers get their cash flow from employers or consumers, who purchase insurance coverage. Employers and consumers typically pay their insurers fixed monthly premiums for their health insurance plans. Health insurers rely on these monthly premiums to pay for the prescription drug needs of their members.

---

[6] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

117.    Pharmacies usually obtain the drugs they distribute from wholesalers or the manufacturers themselves. The wholesalers purchase these drugs directly from the drug manufacturers.

**C.    Benchmark Pricing is a Basis for Reimbursement**

118.    The prices for the drugs distributed in this chain are different for each participating entity: different actors pay different prices for the same drugs. In this system, only a drug's benchmark price—also known as its Average Wholesale Price (AWP) or the mathematically-related, Wholesale Acquisition Price (WAC)—is publicly available.

119.    The prescription drug industry is unusual in that the beneficiary of its products (the patient) often pays no more than a preset fraction of the price of the product (in the case of coinsurance) or a fixed amount (in the case of copays), while intermediaries and third-party payers pay varying prices determined through market transactions, complex contracting agreements that may cover multiple products, or formulaically determined amounts based on a series of pricing benchmarks.

120.    Most branded prescription drugs are sold by drug manufacturers to wholesalers. Prices to wholesalers tend to be based on the benchmark prices that are set by manufacturers or wholesale acquisition costs ("WACs"). Ordinarily, companies set the prices of their drugs at levels that account for multiple competitive factors, including: the drugs' relative safety and efficacy profiles, the prices of available treatment alternatives, the type of drug (for instance, brand or generic), and the total cost to the manufacturer of research and development for the drug entering the marketplace and those that failed to make it to the marketplace.

121.    The use of price benchmarks to calculate and communicate reimbursement payments reflects an efficient method by which to maintain the system's flexibility, minimize uncertainty through predictable costs, maximize coverage in a cost-effective manner, and

- 30 -

provide a mechanism for competition among payers. Payers' reimbursement formulas will often include a series of price benchmarks and payment caps. The price benchmarks used in a payers' formulas are commonly adjusted by a percentage that is contractually set (for commercial payers) or established through regulatory procedures (for public payers). For example, reimbursement could be determined based on the lower of the drug's (i) AWP – $x\%$, (ii) WAC + $y\%$, and (iii) payment cap.

122.    Despite multiple modifications to health insurers' reimbursement policies over time, the most commonly and continuously used set of reference prices in reimbursement and provider payment calculations and negotiations remains AWP.

123.    From an administrative perspective, AWP provides a logical starting point for the calculation and communication of reimbursement to various pharmacy providers for various drugs.  Moreover, given the historical use of AWP by all industry participants, one cannot discount the significance of AWP's entrenchment in the complex and highly automated payment system.  As such, it is widely used as a competitive benchmark and to estimate costs and revenues.

124.    This benchmark serves as the starting points for negotiations between PBMs and drug manufacturers. As previously explained, PBMs create formularies for their health insurer clients, and those formularies significantly influence patients' drug purchasing behavior. Health insurers cover all or a portion of their members' drug costs based on whether and where drugs fall on their PBMs' formularies. Some drug companies offer PBMs "rebates"—essentially discounts off benchmark prices—to influence the PBMs' formulary decisions.

125.   As explained in the following section, consumer pay based on benchmark prices. The prices pharmacies quote consumers are the benchmark prices less a small discount (usually 15%).[7] Thus, as benchmark prices rise, so too do these consumers' out-of-pocket costs.

**D.   Consumer Drug Costs**

126.   *Uninsured*. Uninsured consumers must pay the full, point-of-sale prices (based on benchmark prices) every time they pick up their prescriptions. Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015—remain without coverage. This uninsured population is especially concentrated in states that did not take the Medicaid expansion, where diabetes is prevalent. Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it. The uninsured population may grow drastically in the next few years if the Affordable Care Act is repealed without a suitable replacement or cost-sharing reduction payments are discontinued.

127.   *High-Deductible Plans*. But the uninsured are not the only patients saddled with high out-of-pocket costs. Despite their monthly insurance premiums, insured consumers often pay a significant portion of a drug's benchmark price. Out-of-pocket costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements.

128.   The term "deductible" refers to a set amount of healthcare cost an insured must shoulder (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Once a patient reaches her deductible, her health plan begins to contribute, paying a portion of her healthcare costs. Although most health plans have some form of a deductible, high-deductible

---

[7] This complaint refers to this price as the full, point-of-sale price (based on benchmark price).

health plans are aptly named for their larger-than-average deductibles. And while high-deductible health plans usually boast lower premiums, they are nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high-deductible plans are usually required to pay full, point-of-sale prices (based on benchmark prices) before they reach their deductibles.

129.     The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high-deductible health plans. In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high-deductible health plans, up from 17% in 2011. Although Preferred Provider Organizations (PPOs) are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high-deductible health plans has increased by 8%. Figure 4 illustrates the rising trend in high-deductible plans.

**Figure 4: Percentage of covered workers enrolled in high-deductible health plans from 2006-2016.[8]**



*Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information, see the Survey Methods Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



130.    Moreover, deductibles themselves have risen. The average annual deductible for an individual enrolled in a high-deductible plan is now between $2,031 and $2,295, depending on the exact type of plan.[9] The average annual deductible for family coverage is now between $4,321 and $4,364, again, depending on the type of plan.

131.    A recent Kaiser Family Foundation study found that 30% to 40% of U.S. households with private coverage *do not have enough liquid assets* to pay the deductible required by their health plan. Figure 5 below demonstrates this reality.

---

[8] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

[9] There are two primary types of high-deductible health plans: high-deductible plans with Health Reimbursement Arrangements and high-deductible plans with Health Savings Accounts.

**Figure 5: Share of non-elderly households with liquid assets less than their deductibles among people with private health insurance.[10]**





132. Overall, in the entire employer-based health plan market, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period. Among all individuals enrolled in employer health plans (both high-deductible plans as well as others), the average deductible in 2016 was $1,478.

133. The average deductible for individuals working at smaller firms is higher than that in larger firms ($2,069 v. $1,238).

134. Figure 6 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

---

[10] Drew Altman, *The Biggest Health Issue We Aren't Debating*, Axios (Nov. 22, 2017), https://www.axios.com/the-biggest-health-issue-we-arent-debating-2511098849.html (graphic based on data from Matthew Rae, Gary Claxton, and Larry Levitt, *Do Health Plan Enrollees Have Enough Money to Pay Cost Sharing*, Kaiser Family Found. (Nov. 23, 2017), https://www.kff.org/health-costs/issue-brief/do-health-plan-enrollees-have-enough-money-to-pay-cost-sharing/).

**Figure 6: Percentage of covered workers enrolled in a plan with a general annual deductible of $1000 or more for single coverage, by firm size, from 2006-2016.**[11]





\* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

135.     The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high. The Marketplace health plans are broken into "metal" tiers: bronze, silver, gold, and platinum. The cheapest plans—bronze and silver—unsurprisingly come with very high-deductibles. In 2016, the average deductibles in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

136.     High deductible plans are particularly hard on patients with chronic diseases: Not only do patients living with chronic diseases, like diabetes, hit their deductibles year after year, but they hit their deductibles over a shorter period of time, resulting in significant financial burden at the start of each year. Individuals and families who do not have savings or access to credit often take less insulin than they are prescribed to spread their out-of-pocket payments over a longer period of time.

---

[11] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation 4 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

137.    ***Coinsurance and Copayments***. In addition to their deductibles, individuals with insurance must usually make copayments or coinsurance payments for the healthcare services they need. A copayment is a fixed fee that an individual must pay for a healthcare service at the time of care; for example, when she picks up a prescription. Copayment rates vary depending on the drug; drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

138.    Coinsurance is similar. However, instead of paying a fixed fee for a particular service, individuals with coinsurance arrangements are required to pay a fixed *percentage* of the cost of the healthcare service provided. For drugs, this means a percentage of the drug's *benchmark* price. This percentage varies depending on the drug, with lower coinsurance rates for preferred drugs and higher coinsurance rates for disfavored drugs.

139.    For those in high deductible health plans, copayments and coinsurance obligations begin after they reach their deductibles. Plans that cover prescription drugs right away, not requiring patients to reach deductibles first, usually require copayments or coinsurance contributions for every drug purchase.

140.    For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, the average coinsurance rates are 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs (fourth tier drugs are usually specialty medications, for diseases such as cancer, and are extremely expensive). Lantus, Levemir, Toujeo, Humalog, Novolog, and Apidra are still branded drugs. Therefore, insurance plans generally classify them as second-tier or third-tier drugs on their formularies. As a result, coinsurance payments keyed to the benchmark prices of these medicines can be quite burdensome.

141.    Recently, health plans have been demanding higher and higher coinsurance contributions from patients. Table 1 shows this trend.

**Table 1: Rising Coinsurance Rates**

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

142.    Overall, out-of-pocket spending for prescription drugs has shifted away from copayments, toward deductibles and coinsurance spending over the past decade. In 2014, patients paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to just 4% in 2004. Similarly, patients paid for 20% of their out-of-pocket drug expenses through coinsurance in 2014, compared to just 3% in 2004.

143.    ***Medicare Part D***. Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' benchmark prices. In 2017, the Medicare Part D standard prescription drug plan had a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700. This meant patients in Medicare Part D plans paid full, point-of-sale prices (based on benchmark price) until they spent $400. After they hit this deductible, they paid 25% of the drugs' point-of-sale prices (based on

- 38 -

benchmark prices) until they, together with their plans, spent $3,700 on drugs. Once Part D

patients met this $3,700 coverage limit, they fell into the Coverage Gap, more commonly known

as the "Donut Hole." In the Donut Hole, they were required to pay 40% of their brand-name

drugs' point-of-sale prices. Only once the patients' total out-of-pocket spending (both before and

in the Donut Hole) reached $4,950 did their Medicare Part D plans begin to shoulder 95% of

their healthcare costs again. Figure 7 demonstrates patient cost-sharing in the standard Medicare

Part D plan for 2017.

**Figure 7: The standard Medicare prescription drug benefit in 2017.[12]**



NOTE: Some amounts rounded to nearest dollar. [1]Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.



---

[12] *The Medicare Part D Prescription Drug Benefit,* The Kaiser Family Foundation 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

E.      **Impact on Consumers**

144.    This system of pricing and payment for drugs has been exploited by the defendants and their collaborators, forcing patient consumers to pay drastically higher prices for the analog insulin than their insurers (if they have insurance). If a patient is responsible for all of her drugs' costs before she hits her deductible, she is required to pay *full*, *point-of-sale prices* (based on benchmark prices) until she meets her deductible; if she pays coinsurance, she pays for a percentage of her drugs' *point-of-sale prices* (based on benchmark prices); if she is in a Medicare Part D plan, she pays varying percentages of *point-of-sale prices* (based on benchmark prices). In contrast, the defendants provide institutional insurers, through their PBMs, significant "rebates" or other "discounts" in exchange for formulary placement.[13] Thus, these institutions *never pay* based on benchmark prices; instead, they pay based on the net prices of the drugs, as negotiated by the PBMs.

145.    An example helps illustrate this structure. A woman with diabetes needs to purchase a box of insulin pens. She goes to her local retail pharmacy, where the pharmacist tells her the box's benchmark price is $450. She has health insurance through her employer. Her plan requires her to pay a $2,000 deductible and then 30% coinsurance after she hits her deductible. If she has not yet reached her deductible, she pays $382.50 (benchmark price (AWP) minus 15%, i.e. the point-of-sale price) for the box of insulin. If she has reached her deductible (paid $2,000 in health care costs), she pays $114.75 (382.50 x .3) for the box. The consumer believes her insurer paid the remaining $276.75. But it has not. In fact, in a transaction concealed from the patient, the drug manufacturer has paid an undisclosed amount of money back to the PBM.

---

[13] *See* Congressional Budget Office, *Prescription Drug Pricing in the Private Sector 12* (Jan. 1, 2007).

- 40 -

The PBM then paid a portion of this "rebate" to its insurer client. Thus, the net price of this insulin to the consumer's insurer is much lower than the price she paid.

146.     In the case of analog insulins, the publicly-reported benchmark prices used for consumer transactions has climbed further and further away from the net prices institutional payers pay. The net prices of analog insulins to PBMs and insurers are much lower: 35%, 40%, or even 50% lower than benchmark prices.

147.     Taking the above example one step further: the manufacturer's publicly-reported benchmark price is $450, but its secret net price to PBMs is $229.50 (AWP minus 15%, less a 40% "rebate"). As a result, when the consumer paid $382.50 for the box during her deductible period, she really paid 166% of the net price ($382.50 divided by $229.50). And when she paid $114.75 for her 30% co-insurance, she really paid 50% coinsurance ($114.75 divided by $229.50).

### F.     Drug Manufacturer Manipulation of PBM Incentives

148.     PBMs turn a profit in two primary ways: First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies. Second, PBMs take a cut of the drug price discounts they negotiate with drug companies (with the rest passed on to their health insurer clients). The manufacturers' "rebate" arrangements are meant to create an incentive for PBMs to negotiate lower *real* drug prices. But the manufacturers know that this business model can be manipulated such that PBMs no longer have an incentive to control costs.

149.     PBMs have the greatest leverage to negotiate lower prices when drugs are FDA-approved as bioequivalent or biosimilar, *i.e.*, when a drug "goes generic." But PBMs also have leverage when two or more drug companies manufacture drugs that, while not bioequivalent or biosimilar, are nevertheless in the same therapeutic class and are perceived to have similar

- 41 -

efficacy and risk profiles. That is the case with the analog insulins. In such a scenario, the drug

companies should compete for formulary access by lowering their real prices.

150.    But the Insulin Drug Manufacturers have found a way to game this system. As the

Insulin Drug Manufacturers have realized, the spread between real and benchmark price can be

enlarged by *raising benchmark prices* while holding *net prices constant*. In exchange for this

spread enlargement, the PBMs agree, either explicitly or implicitly, to favor, or at least not

disfavor, the drug with the most elevated benchmark price. The Insulin Drug Manufacturers

know that when they increase the benchmark prices of their insulins, the PBMs can earn

substantially greater revenues so long as net prices remain constant.

151.    The perverse, reverse incentives for larger benchmark prices (and consequent

consumer overpayments) was described in a recent report on the drug industry:

> At the whole-market level, we sense that the price protection
> rebate arbitrage game is driving manufacturers to higher
> benchmark price increases than would otherwise occur,
> particularly on the eve of a general election. Price protection
> rebates between brand manufacturers and PBMs are common, as
> are fixed rebate agreements between PBMs and a significant
> portion of their plan sponsors. When brand manufacturers'
> [benchmark price] increases exceed the price protection threshold,
> the manufacturers rebate the difference to PBMs, who pocket the
> difference when these price protection rebates grow faster than the
> PBMs' fixed rebate commitments to plan sponsors. Thus all else
> equal in a given category, the product with the more rapid
> benchmark price increases is more profitable to the PBM.
> Manufacturers, realizing this, don't want their products
> disadvantaged, and accordingly are driven to keep their rates of
> benchmark price inflation at least as high, and ideally just a bit
> higher, than peers'. Durable benchmark price inflation is the
> natural result. Net price inflation is unaffected, but unit volumes
> suffer as higher benchmark prices directly impact consumers who
> have not yet met their deductibles.[14]

---

[14] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR
LLC, 36 (Oct. 5, 2016).

152.    This is not the first time manipulation of the spread between benchmark and real prices has been the subject of large-scale litigation. In *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the District Court for the District of Massachusetts certified a class alleging that McKesson, a wholesaler, and First Data, a drug price publisher, engaged in a scheme to inflate the benchmark prices of brand name drugs. McKesson asserted that a class could not be certified because the PBMs had become aware of the phony increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for its health insurer clients. However, part of the evidence the district court relied upon in rejecting this argument was evidence showing that the PBMs pocketed a portion of the increase in the spread at the expense of consumers and health insurers:

> Because these PBMs benefited from the increased [benchmark price] spreads perpetuated by the Scheme, Plaintiffs argue that they had no incentive to inform [third party payers] of the inflated AWP, let alone fiercely compete to mitigate any damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent around the same time as the ESI letter, that states that "the AWP increases being pushed through by First Data Bank [are] having a very favorable impact on our mail margins." The e-mail goes on to state, "Our clients will not be sympathetic to our financial situation since we [will have benefited] from the AWP increase in the mail and they hired us to control drug trend." The e-mail includes a handwritten note, in response, "Let's put a lid on it and not make it a big deal."[15]

153.    Just so, Lilly here has used the phony benchmark prices to its advantage. Lilly uses the spread between prices to provide kickbacks to PBMs in exchange for formulary status. Indeed, as the District Court for the District of Massachusetts recently explained, rebates are

---

[15] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

really "direct kickbacks … disguised as market-share discounts and rebates."[16] This "rebate" scheme enables the defendants to maintain preferred formulary positions without reducing their net prices.

154.    And the PBMs benefit from the larger spreads. The PBMs boast of the "increased rebates" they have achieved, when, in reality, the "discounts" they have obtained are simply reductions off artificially-inflated benchmark prices.  In other words, these "discounts" are not discounts at all.

155.    The losers in this scheme are analog insulin consumers. When Lilly inflates benchmark prices so it can offer PBMs larger spreads, it harms: uninsured patients, insured consumers in high-deductible plans, insured consumers paying coinsurance, and insured consumers in Medicare Part D plans, especially those who reach the Donut Hole, all whom pay for insulin based on the medicines' *benchmark* prices.

## V.    ANALOG INSULIN

### A.    Diabetes: The Disease and Demographics

156.    Diabetes is an epidemic in the United States. One in five health care dollars is spent caring for people with diagnosed diabetes. Over 30 million people, 9.4% of the country, live with diabetes. A life-threatening disease, many of those living with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin. Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States. Missed or inadequate insulin therapy can leave diabetics with too little insulin in

---

[16] *United States ex rel. Banigan v. Organon USA Inc.*, 2016 WL 6571269, at *1 (D. Mass. Jan. 20, 2016).

their system, triggering hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days. Diabetic ketoacidosis is responsible for more than 500,000 hospital days per year at an estimated annual direct medical expense and indirect cost of $2.4 billion.[17]

157.    The number of Americans who live with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over 10 million. Just 14 years later, the head count tripled again. Now over 30 million people—9.4% of the country—live with the disease. And this trend does not appear to be slowing: 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of type 2 diabetes.

158.    Diabetes occurs when a person has too much glucose—sugar—in their blood stream. Normally, the human body breaks down ingested food into glucose, which in turn feeds cells and enables them to function. In this process, insulin functions as a key, opening the cells and permitting glucose to enter. A lack of insulin or responsiveness to insulin causes the process to break down. Glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

159.    There are two basic types of diabetes. Roughly 90-95% of Americans living with diabetes developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. When first diagnosed, many type 2 patients can initially be treated with tablets that help their

---

[17] Abbas E. Kitabchi, et al., *Hyperglycemic Crises in Adult Patients with Diabetes*, 32 Diabetes Care 1335, 1335 (2009).

bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce. About a quarter of type 2 patients rely on insulin treatment.

160.     Type 1 diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age. In contrast to type 2 patients, people with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die. Individuals living with type 1 must rely on insulin treatments from the point of diagnosis until death.

161.     If left untreated or under-treated, diabetes can become a debilitating and deadly disease. Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment. People with diabetes are almost twice as likely to have heart disease or a heart attack and one and one-half times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations. Finally, the disease is the leading cause of blindness.

162.     The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders. For example, Native Americans are 420% more likely to die from diabetes-related causes of death than other Americans. With decreased access to nutritious food sources and fitness options, low-income individuals are at a greater risk of obesity and, correspondingly, diabetes. These same demographic groups also account for a disproportionate share of the uninsured.

- 46 -

**B.      The Origins of Insulin Treatment**

163.     Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms and health complications associated with the disease are entirely avoidable. And what's more, unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

164.     In 1922, the two men pioneered a technique for removing active insulin from an animal pancreas that could then be used to treat human patients with diabetes.

165.     A "widely celebrated tale of biomedical serendipity,"[18] this breakthrough is revered for two reasons. First, the duo that discovered how to extract insulin for patient treatment was an unlikely pair: a young orthopedic surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Second, neither Banting nor Best applied for a patent on their game-changing innovation because they wanted to ensure their discovery remained open to the public, available to all. This decision offers a sad commentary on the state of the current pharmaceutical industry.

166.     Ironically, Banting and Best eventually ended up applying for a patent to guarantee access: Banting and Best realized that if they did not patent their drug, someone else would. To prevent others from obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 each. As they wrote to the University's president, the patent was a form of publication: "When the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[19]

---

[18] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[19] M. Bliss, *The Discovery of Insulin* (2013).

167.    After selling their patent to the University of Toronto, university researchers attempted to manufacture insulin on campus. However, they quickly realized they lacked the facilities necessary to meet the demand. Therefore, to scale production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical company with experience producing glandular extracts."[20] Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. In addition to their contract with Eli Lilly, the Toronto team licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulin Laboratorium and Novo Terapeutisk Laboratorium.[21] Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future domination over the sale of insulin products.

168.    Although the Toronto team's early iteration of insulin was immediately perceived as "a lifesaving drug of vast clinical public health significance,"[22] subsequent research led to further improvements in the drug's efficacy. The original animal insulin isolated by the Toronto team was short acting—it only had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. A subsequent innovation in 1946—the addition of zinc to form the crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)— made it possible to combine long-acting and rapid-acting insulin. This advance allowed many

---

[20] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[21] Nordisk and Novo merged in 1989 to form Novo Nordisk.

[22] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

diabetes patients to take a single daily injection. Soon afterward, a method for prolonging the action of insulin without adding protamine was discovered. These developments offered new options for the dosing of insulin. But they also extended the reach of insulin patents into the 1970s.

169.     When the animal-based insulin patents finally began to expire, researchers took another step forward in the development of insulin technology. In the late 1970s, scientists began to produce human insulin through recombinant technology. By 1982, Eli Lilly brought the first recombinant human insulins—Humulin R (regular) and N (NPH)—to the U.S. marketplace. Around the same time, Novo and Nordisk developed methods for chemically converting bovine insulin into human insulin. In 1988, a year prior to merging, Novo and Nordisk obtained approval for their own recombinant insulin. This innovation allowed them to continue shared domination over insulin sales with Eli Lilly. It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin patents, promising to stretch into the 21st century.

170.     After the introduction of human insulin, an improved understanding of the human genetic code and recombinant technology put a third insulin development within reach. In the mid-1980s, scientists began to modify the molecular structure of insulin, attempting to improve its physiological effects. By 1996, Eli Lilly had obtained approval for Humalog (generic name, insulin lispro), the first rapid-acting, man-made insulin. This new type of insulin—known as an analog—allowed for faster absorption times. Never far behind, Novo Nordisk released its own rapid-acting analog, Novolog (generic name, insulin aspart), in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra (generic name, insulin glulisine).

171.     The same technological advances that brought about rapid-acting analogs gave rise to long-acting analogs. In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus (generic name, insulin glargine). Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir (generic name, insulin detemir). The first patents on these long-acting analogs expired in June 2014, nearly a century after Banting and Best's first patent application in 1923.

172.     In 2015, Sanofi launched a higher dosage of insulin glargine, branded as Toujeo. In December 2016, Eli Lilly released its own version of insulin glargine, branded as Basaglar. Basaglar is a follow-on product to Lantus.[23]

---

[23] It is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's (FDCA) Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval. Instead, Basaglar was approved through a different FDCA pathway as a follow-on medication. Table 2 summarizes the current insulin treatment landscape.

| Table 2: Insulin Available in the United States | | | | | | |
|---|---|---|---|---|---|---|
| *Insulin Type* | *Action* | *Brand Name* | *Generic Name* | *Company* | *FDA Approval* | *Benchmark Price (AWP)* |
| *Human* | **Rapid-acting** | Humulin R | Insulin Regular | Eli Lilly | 1982 | $185.88 (vial[i]) |
| | | Novolin R | Insulin Regular | Novo Nordisk | 1991 | $172.13 (vial[ii]) |
| | **Intermediate** | Humulin N | Insulin Suspension Isophane (NPH) | Eli Lilly | 1982 | $185.88 (vial[iii]) |
| | | Novolin N | Insulin Suspension Isophane (NPH) | Novo Nordisk | 1991 | $172.13 (vial[iv]) |
| *Analogs* | **Rapid-Acting** | Humalog | Lispro | Eli Lilly | 1996 | $663.00 (pen[v]) $343.38 (vial[vi]) |
| | | Novolog | Aspart | Novo Nordisk | 2000 | $665.28 (pen[vii]) $344.48 (vial[viii]) |
| | | Apidra | Glulisine | Sanofi | 2004 | $616.04 (pen[ix]) $318.89 (vial[x]) |
| | **Long-Acting** | Lantus | Glargine | Sanofi | 2000 | $479.93 (pen[xi]) $319.96 (vial[xii]) |
| | | Levemir | Detemir | Novo Nordisk | 2005 | $504.38 (FlexTouch[xiii]) $336.24 (vial[xiv]) |
| | | Basaglar | Glargine | Eli Lilly | 2016 | $396.06 (pen[xv]) |
| | | Toujeo | Glargine | Sanofi | 2015 | $736.67(pen[xvi]) |

---

[i] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[ii] Novolin R 100units/ml Solution for Injection (vial, 10 ml Insulin Regular (Recomb) 100U/1mL, Solution for injection).

[iii] Humulin N 100unit/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

[iv] Novolin N 100units/ml Suspension for Injection (vial, 10 ml Insulin Susp Isophane (NPH) (Recomb) 100U/1mL, Suspension for injection).

010646-11 1023320 V1

[v] Humalog KwikPen 100unit/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

[vi] Humalog 100unit/ml Cartridge Solution for Injection (box, 5 cartridges, 3 ml Insulin Lispro 100U/1mL, Solution for injection).

[vii] Novolog Flexpen Prefilled Syringe 100unit/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[viii] Novolog 100unit/ml Solution for Injection (vial, 10 ml Insulin Aspart (Recomb) 100U/1mL, Solution for injection).

[ix] Apidra SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glulisine 100U/1mL, Solution for injection).

[x] Apidra 100unit/ml Solution for Injection (vial, 10 ml Insulin Glulisine 100U/1mL, Solution for injection).

[xi] Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[xii] Lantus 100units/mL Solution for Injection (vial, 10 ml Insulin Glargine 100U/1mL, Solution for injection).

[xiii] Levemir FlexTouch 100units/ml Solution for Injection (box, 5 pre-filled syringes, 3 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[xiv] Levemir 100units/ml Solution for Injection (vial, 10 ml Insulin Detemir (Recombinant) 100U/1mL, Solution for injection).

[xv] Basaglar KwikPen 100units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 3 ml Insulin Glargine 100U/1mL, Solution for injection).

[xvi] Toujeo SoloStar 300units/mL Pre-Filled Pen Solution for Injection (box, 5 pens, 1.5 ml Insulin Glargine 300U/1mL, Solution for injection).

## C.   Current Insulin Treatment Landscape

173.    Today, analogs dominate insulin sales. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, it can be used in more flexible ways.

174.    The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

175.     For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

176.     For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[24] Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

177.     But doctors still prefer to prescribe analog insulins to type 2 patients. A recent study found that as of 2010, among adults who filled prescriptions for more than one brand of insulin, 91.5% filled prescriptions for insulin analogs. The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin. Now, type 2 patients use human insulin less frequently: the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.

---

[24] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b0a3e07418e 06fb5e894fb4314f05&keytype2=tf_ipsecsha.

**Figure 8: Type of insulin used among U.S. adults with type 2 diabetes (who filled more than one prescription).[25]**



178.    In 2016, the top three selling insulins were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

**D.    Climbing Insulin Benchmark Prices**

179.    Despite the availability of a number of highly effective insulin drugs, too many people living with diabetes go without proper treatment for an all too familiar reason: cost.

180.    Novo Nordisk's current benchmark prices (AWP) for Levemir were $504.38 for a package of pens and $336.24 for a vial at the end of 2017. Novo Nordisk's benchmark prices for Novolog sat at $665.28 for a package of pens and $344.48 for a vial at the end of 2017. Most

---

[25] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

diabetes patients need at least one package of insulin per month. Figures 9 and 10 demonstrate Novo Nordisk's price increases from 2006 to 2016 for Levemir and Novolog.

**Figure 9: Rising benchmark prices of Levemir vials and pens from 2006-2016.**



Rapid Rising Benchmark Prices of Levemir Pens, 2006-2016

- Levemir FlexTouch 100units/ml Solution for Injection
- Levemir FlexPen 100units/ml Solution for Injection

010646-11 1023320 V1

**Figure 10: Rising benchmark prices of Novolog vials and pens from 2006-2016.**



181.    Eli Lilly raised the benchmark prices of Humalog to $663.00 for a package of pens and $343.38 for a vial by the end of 2017. Figure 11 demonstrates Eli Lilly's price increases from 2006 to 2016 for Humalog.

- 56 -

**Figure 11: Rising benchmark prices of Humalog vials and pens from 2006-2016.**



182.    Sanofi's benchmark prices for Lantus, the top-selling analog insulin, sat at $479.93 for a package of pens and $319.96 for a vial at the end of 2017. Sanofi's benchmark prices for Apidra were $616.04 for a package of pens and $318.89 for a vial at the end of 2017. Sanofi's benchmark price for Toujeo is $442 for a package of Toujeo pens. Figures 12 and 13 demonstrate Sanofi's price increases from 2006 to 2016 for Lantus and Apidra vial and pen packages.

**Figure 12: Rising benchmark prices of Lantus vials and pens from 2006-2016.**



**Figure 13: Rising benchmark prices of Apidra vials and pens from 2006-2016.**



183.    The benchmark prices of insulin analogs have not always been so high. In just the last five years, Sanofi and Novo Nordisk have raised Lantus and Levemir's reported prices an astounding 168% and 169%, respectively. In fact, in 2016, Novo Nordisk and Sanofi were responsible for the highest drug benchmark price increases in the *entire pharmaceutical industry*. This distinction largely reflected their price hikes for Lantus and Levemir. Figure 14 shows Novo Nordisk, Eli Lilly, and Sanofi's exponential benchmark price hikes from 2000 to 2015.

**Figure 14: Rising insulin benchmark prices from 2000-2015.**[26]



184.    Novo Nordisk, Eli Lilly, and Sanofi have not only dramatically increased their insulins' benchmark prices in the last 10 years, they have done so in perfect lock-step. In 13 instances since 2009, Sanofi and Novo Nordisk raised the benchmark prices of their long-acting analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the decimal point within a few days of each other." As one healthcare analyst put it: "That is pretty much a clear signal that your competitor doesn't intend to price-compete with you." Novo Nordisk, Eli Lilly, and Sanofi have engaged in the same lock-step behavior with respect to their rapid-acting analog insulins, Novolog, Humalog, and Apidra, respectively. Figures 15 and 16 demonstrate this seemingly collusive behavior with respect to Lantus and Levemir, with the entry of Eli Lilly's Basaglar and Sanofi's Toujeo noted as well. Figures 17 and 18 demonstrate this behavior with respect to Novolog, Humalog, and Apidra.

---

[26] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

**Figure 15: Rising benchmark prices of long-acting insulins from 2006-2016.**



**Figure 16: Rising Lantus and Levemir benchmark prices from 2001-2015.**



**Figure 17: Rising benchmark prices of rapid-acting insulin from 2006-2016.**



**Figure 18: Rising Humalog and Novolog benchmark prices from 1996-2016.**



### E. Novo Nordisk, Eli Lilly, and Sanofi have sold increased spreads to PBMs in exchange for (or as a kickback for) preferred formulary status.

185.    In the past, Novo Nordisk maintained that their price increases reflected the "clinical benefit" of their drugs.[27] But Levemir and Novolog are the exact same drugs that they were 10 years ago—their clinical benefits have not changed. Where clinical benefit has not changed, it cannot be used to justify a 169% price increase. Therefore, another factor motivates these benchmark price increases.

186.    The real reason Novo Nordisk, Eli Lilly, and Sanofi have increased their benchmark prices is because these firms choose to compete based on hidden rebates to PBMs

---

[27] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html.

rather than transparent prices for all. PBMs control the formularies that determine whether people living with diabetes will purchase Novo Nordisk, Eli Lilly, or Sanofi's drugs. The Insulin Drug Manufacturers have realized that they can manipulate the PBMs' formulary choices by artificially inflating benchmark prices, rather than lower net prices.

187. Under pressure to explain its rising benchmark prices, Novo Nordisk admitted to this behavior in a recent press release. On November 30, 2016, Novo Nordisk stated:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . . News reports on drug prices have left the public with an impression that companies like ours realize all the profits from the "[benchmark] price" increases we've made over the last decade. In other words, a [benchmark] price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "[benchmark] price" and have full accountability for those increases. However, after we set the [benchmark] price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[28]

Explaining the company's benchmark price increases, Novo Nordisk directly admitted that it "set[s] [benchmark] price" with an eye to achieving "preferred" formulary status.

188. For over a decade, Novo Nordisk has steeply raised the benchmark prices of Levemir and Novolog while keeping the net prices of these medicines constant. Figures 19 and 20 (included in Novo Nordisk's press release) illustrate this conduct.

---

[28] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

**Figure 19: Real versus Benchmark Prices of Novolog Vials[29]**



**Figure 20: Real versus Benchmark Prices of Novolog FlexPens[30]**



---

[29] Novo Nordisk Press Release, *supra*.

[30] *Id.* The FlexPen is a type of insulin injection. Patients who use this pen stick themselves with a pen-like insulin distributor instead of injecting insulin through a pump or syringe.

189. Lilly, too, has admitted that it raises benchmark prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[31]

190. Finally, Sanofi has conceded its participation in this formulary scheme:

> [S]ince 2014, we have increased the level of rebates granted for Lantus® in order to maintain favorable formulary positions with key payers in the US.[32]

191. Sanofi's manipulation of the spread between benchmark and net price is visible in Figure 21.

**Figure 21: Real versus Benchmark Price of Lantus**



Percentage change since 2007
List price   Net price

Sources: Truven Health Analytics (list prices) and Bernstein (net price estimates)
THE WALL STREET JOURNAL.

---

[31] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

[32] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2016).

- 67 -

192.    Novo Nordisk, Eli Lilly, and Sanofi's spread-increasing behavior is also visible from data on these companies' "rebates" to PBMs and insurers. The two figures below illustrate Novo Nordisk's "rebates" from 2007 to 2014.

**Figure 22: Novo Nordisk's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



010646-11 1023320 V1

**Figure 23: Novo Nordisk's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



*Source: Company data, Credit Suisse estimates*

193.    Eli Lilly has also greatly increased its spreads. Figures 24 and 25 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 24: Eli Lilly's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



*Source: Company data, Credit Suisse estimates*

- 69 -

**Figure 25: Eli Lilly's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



194.    Finally, Sanofi has greatly increased its spreads. Figures 26 and 27 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 26: Sanofi's reported "rebates" as a percentage of U.S. gross sales from 2007-2014.**



**Figure 27: Sanofi's selling, general, and administrative costs and rebates as a percentage of gross U.S. sales from 2007-2014.**



Source: Company data, Credit Suisse estimates

195.    Sanofi and Novo Nordisk have stretched the spreads on their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry. In an industry where artificial benchmark-price inflation has become common, Novo Nordisk, Eli Lilly, and Sanofi are three of the worst offenders.

196.    Although Lilly and the other manufacturers claim they "need" to inflate their benchmark prices to obtain formulary status, this explanation omits a crucial detail. Drug companies could compete for formulary status in a manner that would help consumers: *they could significantly lower their real prices, instead of inflating their benchmark prices*. Yet, the insulin manufacturers refuse to significantly lower their net prices. And the PBMs continue to accept their benchmark-raising behavior so long as net prices stay constant.

**F.    Lilly's benchmark price inflation deceived and harmed the plaintiffs and class members.**

197.    Lilly's benchmark price inflation has deceived the plaintiffs and class members. During the class period, the vast majority of plaintiffs and class members had no idea that the

benchmark price they struggled to afford were not only different from the price PBMs and insurers receive, but actually trended in an *entirely different direction*.

198.     As the benchmark price of Humalog soared further and further away from its net price, this benchmark price became so misrepresentative, so untethered from its true average price as to be fraudulent.

199.     During the class period, Lilly deliberately and intentionally published benchmark prices that did not reflect the actual, market prices of Humalog. Instead, these benchmark prices were fabricated overstatements of the true prices of Humalog; inflation designed to create net-to-benchmark price spread that Lilly could market to PBMs in exchange for formulary status.

200.     Lilly concealed its Humalog net price and prevented the plaintiffs and class member from knowing what this price was to ensure the PBMs could and would benefit from the spread between the net and benchmark price. Put another way, Lilly's publication of the benchmark price, while concealing the net price, is the basis for the *quid pro quo* with the PBMs. If consumers did not understand benchmark price as reasonable approximation of the cost of Humalog—as reasonable basis for their cost-sharing obligations—PBMs and health insurers would not be able to use the benchmark price as a basis for consumer cost-sharing. If the PBMs could not use the benchmark price as a basis for reimbursement, the spread between benchmark and net price would evaporate. Without a spread to sell, Lilly would have nothing to offer PBMs in exchange for preferred formulary status except lower real prices.

201.     Instead, the spread scheme enabled Lilly to offer something of value to the PBMs (large spreads on which to make profits) in exchange for preferred formulary status. If Lilly did not have this spread to offer, it would have been forced to compete for preferred formulary status through lower prices. Put simply, without the fraudulent spread scheme, Lilly would have

competed for PBM market share in the way competitors do in a healthy market: by lower real prices. Such competition would have benefited the plaintiffs and class members greatly. But instead of competing on real price, Lilly competed on spread.

202.    To do so, Lilly closely guarded its pricing structures. Lilly kept the net prices it offered to the three largest PBMs a secret.

203.    In sum, Lilly concealed that: (i) its benchmark prices were highly-inflated, (ii) it was manipulating the benchmark prices of Humalog, and (iii) the benchmark prices bore no relationship to the prices paid for, or the pricing structure of, Humalog as it was sold to PBMs and health plans.

204.    Plaintiffs relied on Lilly's representations regarding benchmark prices and paid for Humalog based on the artificially inflated benchmark prices to their detriment. The plaintiffs, unaware of the true facts about the pricing of Humalog, continue to pay for the medicine based on benchmark price, the only price truly available to them.

205.    As a result of Lilly's deceptive, unfair, and unconscionable conduct, the plaintiffs and members of the class have overpaid for Humalog when they pay for it based on benchmark price. As previously explained, the Insulin Drug Manufacturers' benchmark price inflation harms the plaintiffs and class members. People living with diabetes who are uninsured, who are in high-deductible plans, who have high coinsurance rates, and/or who are in Medicare Part D plans must pay for their analog insulins based on Lilly's fictitious *benchmark* prices. The amount they have overpaid is the difference between Humalog's point-of-sale price and a reasonable approximation of Humalog's net prices.

206.    Currently, 150 million Americans get healthcare insurance through their employers. Increasingly, individuals within this group are unable to afford their prescribed

insulins due to the cost-sharing obligations their health plans impose. A 2014 study found that among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.

207.    In fact, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 than patients *in any other disease class*. As Figure 27 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000.

**Figure 28: Conditions that are more likely to lead to high out-of-pocket spending.**



208.    The increasing number of patients with high-deductible plans and coinsurance obligations, together with the rise in coinsurance rates, has made the pain associated with the analog insulin price hikes particularly acute. Although insulin has been available for over 100

years, Novo Nordisk's, Eli Lilly's, and Sanofi's price hikes are now making it harder than ever to obtain insulin.[33]

209.    Lilly's pattern of fraudulent conduct in artificially inflating the benchmark prices of Humalog directly and proximately caused plaintiffs and the members of the class to substantially overpay for that drug.

210.    The plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice nor learn of the factual basis for their claims in this complaint and the injuries suffered therefrom until recently.

## G.    The Real Impact of Artificial Pricing

211.    For many plaintiffs and class members, the artificial price inflation has cost them their health, financial stability, and emotional wellbeing. Unable to afford the price increases, many plaintiffs have begun to engage in highly risky behaviors with respect to their disease. Plaintiffs report under-dosing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness. Multiple plaintiffs have lost their vision as a result of their inability to consistently afford insulin. Others have experienced loss of kidney function, and have had to have kidney transplants. Ineffective control of blood sugar can also cause sustained hyperglycemia and, in severe cases,

---

[33] The Affordable Care Act sets a limit for patient out-of-pocket spending. For 2017, the Affordable Care Act has capped out-of-pocket costs at $7,150 for an individual plan and $14,300 for family plans. Nevertheless, for many low-income and middle-income individuals and families, these ceilings provide little relief—many cannot afford to hit them.

diabetic ketoacidosis—a life-threatening condition. Many plaintiffs describe multiple trips to the emergency room for diabetic ketoacidosis. Other plaintiffs explain that their insulin costs have left them unable to afford the healthy diets they should be maintaining. Too many plaintiffs re-use needles and pen tips to cut back on their diabetes costs. This practice is dangerous as it can cause infection. Others attempt to lower their costs by skipping the glucose testing they should be doing prior to injecting insulin. Foregoing glucose testing can lead to under- or over-dosing insulin. While analog insulin should be improving the health of plaintiffs, the Insulin Drug Manufacturers' price hikes have had the opposite effect.

212.     The toll of the price hikes is not just physical: the high cost of insulin causes serious financial difficulty and emotional stress. Multiple class members spend over 50% of their income on their insulin supplies. Plaintiffs describe going into debt, taking out loans, moving back in with their parents, and quitting school to pay for their insulin. Multiple plaintiffs state that they keep the heat low—even in the dead of winter—so they can afford insulin. Parents of children with diabetes describe the anguish of not being able to afford pre-kindergarten and other educational services for their children due to their insulin costs. They say that the cost of insulin is a huge stress in their children's lives, as these young patients realize the financial strain their disease puts on their families. As one plaintiff, whose son has type 1 diabetes, explained:

> As a mom, of course I would sacrifice anything for my child, so over the years, we have had to learn to adjust to living around the cost of insulin. [My son] and his sisters live at home and commute to a nearby college instead of being able to go off to college, . . . all with keeping in mind that we all need to learn a lifestyle of constantly fearing the cost to keep [my son] going, as this is a lifelong disease. However, the most immediate financial consequence came that very first month of diagnosis when we had not budgeted for a sudden increase in our bills. So when [we were] suddenly hit with an extra expense for insulin, the first thing to go was the youngest sibling's pending preschool tuition. This cost was the easiest to cut financially, but not mentally/emotionally. We

> could not cut our other bills (mortgage, utilities, etc.) much more, so my youngest child has forgone her early childhood education. It makes me feel like a horrible mother to admit, but that was our panic response to save ourselves from going into more debt. We are a family that . . . works hard for everything we have. We don't take handouts or accumulate debt. We put ourselves through college and earn all that we have. We value a strong work ethic; we are middle America. Since [my son's] diagnosis, every penny I spend and save is with affording insulin in mind. Since type 1 is hereditary, an autoimmune disease, any of our other children could be diagnosed at any time, and their children, and so on, so in that sense, our entire family is 100% insulin dependent, and it could span generations. Without it, my son can't survive.

Every class representative described the anxiety associated with their insulin costs as all-consuming and constant.

213.    Cognizant of the damage increasing benchmark prices have inflicted on patients, Novo Nordisk and Eli Lilly have recently announced that they will take steps, going forward, to rein in this harm. In its November 30, 2016 press release, Novo Nordisk made a modest commitment to "limit[] any potential future benchmark price increases for our medicines to no more than single-digit percentages annually."[34] On December 13, 2016, Eli Lilly announced that, starting on January 1,[35] patients who pay full-retail prices out-of-pocket for Eli Lilly's insulin will gain access to 40% discounts on their Eli Lilly's insulins.[36]

214.    Long overdue, these affordability measures still do not end or even address the insidious practice of artificially inflating the spread between benchmark and net price. Nor do they make whole the patients who have spent thousands of dollars out-of-pocket on long acting insulins for the past few years. Therefore, these measures fail to address the structural issues that

---

[34] Novo Nordisk Press Release, *supra*.

[35] Eli Lilly Press Release (Dec. 13, 2016), https://investor.lilly.com/releasedetail.cfm?ReleaseID=1003887.

[36] *Id.*

- 77 -

have given rise to the price hikes that have hurt under-insured and uninsured diabetes patients for years.

215.    Individuals living with diabetes spend, on average, twice as much as those without the disease despite the fact that treatment for the disease has existed for more than 100 years. Diagnosed diabetes now costs the United States over $245 billion per year; an estimated $1 of every $5 spent on health care in the United States. The Insulin Drug Manufacturers' artificial inflation of analog insulin prices has pushed, and will continue to push, access to life-saving drugs out of reach of uninsured and underinsured American diabetes patients, even despite recent efforts to control prices. Without access to proper treatment, diabetes patients experience serious and costly health complications. Despite Banting and Best's efforts to ensure insulin was widely accessible, the pharmaceutical companies that have inherited their legacy have eschewed this aspiration, sublimating it to the companies' profit margins. The fraudulent practice of creating a large spread between benchmark and real prices has harmed and will continue to harm diabetes patients across the country. Millions more will suffer painful complications and early death unless Novo Nordisk, Eli Lilly, and Sanofi make analog insulin more affordable.

216.    This case focuses on the overcharges the plaintiffs have incurred as a result of the fraudulent scheme. Plaintiffs seeks relief from these overcharges.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery Rule Tolling

217.    Plaintiffs and class members had no way of knowing about the scheme and deception with respect to insulin pricing.

218.     The manufacturers and PBMs refuse to disclose the real, net prices of insulin, labeling them trade secrets.  Hence, a reasonable plaintiff and consumer could not discover the truth.

219.     Within the time period of any applicable statutes of limitation, plaintiffs and members of the proposed class could not have discovered, through the exercise of reasonable diligence, that Lilly was concealing the conduct complained of herein and misrepresenting the true cost of insulin.

220.     Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Lilly was engaged in the scheme and were publishing phony benchmark prices, nor would a reasonable and diligent investigation have disclosed the true facts.

221.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all insulin products identified herein.

**B.     Fraudulent Concealment Tolling**

222.     All applicable statutes of limitation have also been tolled by Lilly's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

**C.     Estoppel**

223.     Lilly was under a continuous duty to disclose to plaintiffs and class members the true character, quality, and nature of the benchmark prices upon which their payments for insulin were based.

224.     Based on the foregoing, Lilly is estopped from relying on any statutes of limitations in defense of this action.

- 79 -

## VII.   DIRECT DAMAGE SUSTAINED BY PLAINTIFFS

225.    Plaintiffs pay for their analog insulin medications based upon the benchmark

prices (AWP or WAC) Lilly set for Humalog. Accordingly, plaintiffs are directly damaged by

the defendant's fraudulent benchmark pricing schemes for Humalog.

## VIII.   CLASS ACTION ALLEGATIONS

226.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as

follows:

> All individual persons in the United States and its territories who
> paid any portion of the purchase price for a prescription of
> Humalog at a price calculated by reference to a benchmark price,
> AWP (Average Wholesale Price) or WAC (Wholesale Acquisition
> Price) for purposes other than resale.

227.    The class period is tolled to the earliest date of Lilly's initiation of the scheme

described herein, wherein Lilly artificially inflated the benchmark price of Humalog (the analog

insulins) to offer PBMs higher spreads in exchange for preferred formulation status (the spread

scheme).

228.    Excluded from the class are Eli Lilly and any entity in which it has a controlling

interest, and their legal representatives, officers, directors, assignees, and successors.

229.    There are a number of ways in which an individual person may pay a portion of

the benchmark price of an analog insulin and thereby gain inclusion in the class. First, a person

may be uninsured and, therefore, responsible for paying 100% of the cost of his/her analog

insulins based on the Insulin Drug Manufacturers' benchmark prices (the uninsured scenario).

Second, a person's insurance plan may require his/her to satisfy a deductible before insurance

benefits cover all or a portion of his/her prescription needs. If so, that person is paying for 100%

of the cost of his/her analog insulins based on the Insulin Drug Manufacturers' benchmark prices

before he/she meets his/her deductible (the deductible scenario). Third, a person may have a coinsurance requirement. If so, that person is paying a portion of the cost of his/her analog insulins based on the Insulin Drug Manufacturers' benchmark prices (the coinsurance scenario). Fourth, a person may obtain insurance through a Medicare Part D Plan.  If so, that person is paying a portion of the cost (or 100% of the cost before she meets her deductible) based on Insulin Drug Manufacturers' benchmark prices (the Medicare Part D scenario).

230.    In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the "Medicaid Part D" scenario—a person's out-of-pocket expenses for the analog insulins is determined based on the benchmark prices Insulin Drug Manufacturers unilaterally set for these drugs. Accordingly, each falls within the class definition.

231.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for the insulins throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The class is readily identifiable from information and records in the possession of Eli Lilly.

232.    Plaintiffs' claims are typical of the claims of the members of the class. Plaintiffs and all members of the class were damaged by the same wrongful conduct of the defendants—*i.e.*, as a result of Lilly's misconduct, these purchasers paid artificially inflated prices for the analog insulins.

233.    Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

234.    Lead counsel that represents the plaintiffs are experienced in the prosecution of class action litigation and have particular experience with class action litigation involving pharmaceutical products and extensive experience in class actions concerning the use of benchmark pricing, including two cases in federal district court (*AWP* and *McKesson*) that resulted in recoveries well in excess of $500 million.

235.    Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because the defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate. Such generally-applicable conduct is inherent in the defendant's wrongful conduct.

236.    Questions of law and fact common to the class include, but are not limited to:

    i.    Whether Eli Lilly engaged in a fraudulent, unfair, and/or deceptive scheme or course of conduct that improperly inflating the benchmark prices of Humalog the plaintiffs and class members purchased;

    ii.    Whether Eli Lilly artificially inflated the benchmark prices of Humalog;

    iii.    What the benchmark prices versus net (true average) prices for Humalog are;

    iv.    Whether it was the policy and practice of Lilly to prepare marketing and sales materials for PBMs that contained comparisons of their benchmark prices and net prices for Humalog and the spreads available;

    v.    Whether Eli Lilly engaged in a pattern and practice of paying illegal kickbacks, disguised as "rebates," to PBMs, such as CVS Health, Express Scripts, and OptumRx, that created substantial spreads between the benchmark and net prices;

    vi.    Whether the large benchmark-to-net price spreads were intended to induce CVS Health, Express Scripts, and OptumRx to give Lilly's Humalog favorable placement on the PBMs' formularies;

    vii.    Whether Lilly used artificially inflated benchmark prices as a starting point for negotiating these kickbacks or "rebates" for Humalog;

viii.   Whether Lilly conspired with the PBMs for the purpose of carrying out this spread scheme;

ix.   Whether the spread scheme caused plaintiffs and class members to make inflated payments based on benchmark prices for Humalog;

x.   Whether Eli Lilly engaged in a pattern of deceptive and/or fraudulent activity intended to defraud or deceive plaintiffs and class members;

xi.   Whether Eli Lilly formed one-on-one enterprises with each of the largest PBMs—CVS Health, Express Scripts, and OptumRx—for the purpose of carrying out the spread schemes;

xii.   Whether Lilly engaged in mail or wire fraud in furtherance of the spread schemes;

xiii.   Whether Lilly's conduct violated RICO;

xiv.   Whether Lilly is liable to plaintiffs and class members for damages for conduct actionable under the various state consumer protection statutes; and

xv.   Whether Lilly is liable to plaintiffs and the class members for damages flowing from its misconduct.

237.   Plaintiffs and members of the class have all suffered, and will continue to suffer, harm and damages as a result of the defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal

- 83 -

litigation in that it conserves the resources of the courts and the litigants, and promotes

consistency and efficiency of adjudication. Additionally, Lilly acted and failed to act on grounds

generally applicable to plaintiffs and the class and require Court imposition of uniform relief to

ensure compatible standards of conduct toward the class, thereby making appropriate equitable

relief to the class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

238.    Plaintiffs know of no special difficulty to be encountered in the maintenance of

this action that would preclude its maintenance as a class action.

## IX.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)
### (AGAINST LILLY)

239.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and

incorporate herein by reference each of the allegations contained in the preceding paragraphs.

240.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's

purpose.

**A.    Lilly is a culpable "persons" under RICO.**

241.    This count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against Eli Lilly on behalf of the plaintiffs and class members as

represented by the named plaintiffs.

242.    Plaintiffs, the members of class, and Lilly are each "persons," as that term is

defined in 18 U.S.C. § 1961(3).

243. The following pharmacy benefit managers are each "persons," as that term is defined in 18 U.S.C. § 1961(3): (a) CVS Health Corporation (CVS), a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895, is one of the largest PBMs in the United States and provides comprehensive prescription benefit management services to over 2,000 health plans, covering 65 million lives; (b) Express Scripts, Inc. (Express Scripts), a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri, 63121, is one of the largest PBMs in the United States and covers 79 million lives; and (c) OptumRx, Inc. (OptumRx), a California Corporation with its principal place of business located at 2300 Main St., Irvine, California, 92614 , is one of the largest PBMs in the United States and covers 65 million lives.

**B.     The Manufacturer-PBM RICO Enterprises**

244. For purposes of this claim, the RICO "enterprises" are associations-in-fact consisting of (a) one of the three largest PBMs—CVS, Express Scripts, or OptumRx—that administers purchases of the analog insulins (including Humalog), and (b) Lilly including its directors, employees and agents. For example, CVS and Lilly form one such association-in-fact enterprise. More specifically, the enterprises are: (1) Lilly-CVS, (2) Lilly Express Scripts and (3) Lilly-OptumRx, Inc. These association-in-fact enterprises are collectively referred to herein as the "Lilly-PBM Insulin Pricing Enterprises."

245. The Lilly-PBM Insulin Pricing Enterprises are an ongoing and continuing business organizations consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of selling, purchasing, and administering the analog insulins to individual plaintiffs and class members and deriving secret profits from these activities (the spread scheme). These profits are greater than either Lilly or the PBMs could obtain absent their fraudulent concealment of the substantial rebates from Lilly to PBMs.

- 85 -

246. To accomplish this common purpose, Lilly and the other Insulin Drug Manufacturers periodically and systematically inflate the benchmark prices of the analog insulins. They did so willfully. The Enterprises then represented—either affirmatively or through half-truths and omissions—to the general public and consumers, including plaintiffs and the class, that Humalog's benchmark prices were a reasonable approximation of the actual cost of this drug. The Lilly-PBM Insulin Pricing Enterprises conceal from the general public and consumers, like the plaintiffs and class members, the reality that the net prices offered to PBMs in exchange for preferred formulary positions are *exponentially lower.*

247. It is this scheme that is fraudulent. Lilly's benchmark price is no longer a reasonable approximation of the actual price of Humalog, and the Lilly-PBM Insulin Pricing Enterprises concealed the magnitude of the spreads between benchmark prices and net prices from the plaintiffs and the class. The Lilly-PBM Insulin Pricing Enterprises also concealed from the public the purpose of these spreads: the spreads ultimately result in higher profits for the drug manufacturers, through ensuring formulary access without requiring significant price reductions; and they result in higher profits for the PBMs, whose earnings increase as the spread between benchmark and real prices grows.

248. Each of the Lilly—PBM Insulin Pricing Enterprises also share a common purpose of perpetuating use of Humalog benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. Lilly would not be able to market large spreads to PBMs in exchange for favorable formulary positions without the use of the inflated benchmark prices as the basis for consumer cost-sharing and out-of-pocket payments in the pharmaceutical industry. The PBMs share this common purpose because, without the use of the inflated benchmark prices, their profits on the spread between benchmark and net prices would

collapse. As a result, PBMs have, with the knowing and willful participation and assistance of the drug manufacturers, engaged in hidden profit-making schemes falling into three general categories: (i) garnering rebates and other "soft dollars" from drug manufacturers that the PBMs, to a large extent, keep; (ii) pocketing secret spreads between net and benchmark analog insulin prices; and (iii) keeping secret discounts the drug manufacturers provide in association with the PBMs' mail order operations.

249.    Each of the Lilly-PBM Insulin Pricing Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Lilly and each PBM that is an associate. As to each of the Lilly-PBM Insulin Pricing Enterprises, there is a common communication network by which Lilly and each PBM share information on a regular basis, including information regarding Humalog benchmark prices and net prices. Each of the Lilly-PBM Insulin Pricing Enterprises, function as a continuing unit. At all relevant times, each of the Lilly-PBM Insulin Pricing Enterprises are operated by Lilly for criminal purposes, namely, carrying out the spread scheme.

250.    At all relevant times, the PBMs have been aware of the Lilly-PBM Insulin Pricing Enterprises' conduct, have been knowing and willing participants in that conduct, and have reaped profits from that conduct. The PBMs strike rebate deals with Lilly to conceal the true net prices of Humalog and profit from the inflated benchmark prices. The PBMs have represented to the public that the rebates they negotiate save health care payers and their plan members (including plaintiffs and members of the class) money on their prescription needs. But they have known that the increasing spreads did not and do not actually decrease the net prices of Humalog: the benchmark prices were and are falsely inflated while the net prices have remained, more or less, constant. But for the Lilly-PBM Insulin Pricing Enterprises' common purpose of

- 87 -

enlarging the hidden spreads between net and benchmark price, the PBMs would have had the incentive to disclose the fraudulence of benchmark prices. By failing to disclose this information, the PBMs and Lilly perpetuated the conduct of the Lilly-PBM Insulin Pricing Enterprises.

251.    Further, the PBMs took instructions and commands from Lilly regarding use of Humalog benchmark prices, not only so that they could keep part of the spread, but also so as to continue to earn from Lilly: (i) *access rebates* for placement of products on their formulary; (ii) *market share rebates* for garnering higher market share than established targets; (iii) *administrative fees* for assembling data to verify market share results; and (iv) *other fees and grants* in an effort to promote products.

252.    In order to garner all of these fees from Lilly, each PBM and Lilly meet on a regular basis to discuss analog insulin prices, spreads, marketing opportunities and coordination of all of the above.

253.    There is a common communication network between each PBM and Lilly for the purpose of implementing the rebate scheme and for the exchange of financial rewards for the PBM activities that benefits Lilly.

254.    At all relevant times, each one of the PBMs was aware of Lilly's spread scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.

255.    For purposes of this count, the Lilly-PBM Insulin Pricing Enterprises are further identified as follows:

**1.      The Eli Lilly-PBM Enterprises:**

256.    The Eli Lilly-PBM Enterprises are three separate associations-in-fact consisting of each of the PBMs that administered purchases of Eli Lilly's Humalog, including its directors, employees, and agents, and Eli Lilly, including its directors, employees and agents: (1) the Eli Lilly-CVS association-in-fact enterprise; (2) the Eli Lilly-Express Scripts association-in-fact

- 88 -

enterprise; and (3) the Eli Lilly-OptumRx association-in-fact enterprise. Each of the Eli Lilly-PBM Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of exchanges kickbacks or "rebates" for preferred formulary positions for Eli Lilly's rapid-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion of competitor products. Each of the Eli Lilly-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx. As to each of these Eli Lilly-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx share information on a regular basis. As to each of these Eli Lilly-PBM Enterprises, Eli Lilly and CVS, Eli Lilly and Express Scripts, and Eli Lilly and OptumRx function as continuing but separate units. At all relevant times, each of the Eli Lilly-PBM Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the spread scheme.

257.   The Lilly-PBM Insulin Pricing Enterprises knowingly made material misrepresentation to the general public in furtherance of the fraudulent scheme regarding:

a.   The net prices of Humalog;

b.   The extent to which the net prices of Humalog departed from their artificially-inflated benchmark prices;

c.   That Humalog's benchmark prices served as a reasonable cost-sharing benchmark and that this benchmark price was a fair basis on which to base consumer out-of-pocket payments;

d.      The extent to which Lilly and the PBMs negotiated the rebates discounting the benchmark prices of Humalog in good faith and for a proper purpose;

e.      Whether the rebates were intended to benefit plan members and/or the general public;

f.      Whether the rebates saved plan members and the general public money;

g.      Whether the "preferred" formulary status of Humalog reflects the drugs' safety, efficacy, or cost-effectiveness, as determined by the PBMs' formulary committees;

h.      Whether Humalog would have been placed in "preferred" formulary positions absent the spreads; and

f.      The extent to which the spread schemes forced plaintiffs and the class members to incur additional expenses for their analog insulins prescriptions.

258.    Lilly alone could not have accomplished the purposes of the Lilly-PBM Insulin Pricing Enterprises without the assistance of the PBMs. For Lilly to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formularies, on which varying analog insulins were given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured lower prices. The lower prices were fictitious, the result of a deliberate scheme to create large spreads without lowering net prices. Without these misrepresentations, the enterprises could not have achieved their common purpose.

259.    The impacts of the Lilly-PBM Insulin Pricing Enterprises are still in place, *i.e.*, the increased spreads between the benchmark and net prices of Humalog are still being maintained and increased.

- 90 -

260.    The foregoing evidences that Lilly and PBMs were each willing participants in the Lilly-PBM Insulin Pricing Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a structure designed to effectuate the Enterprises' purposes, *i.e.*, to increase profits for both Lilly and the PBMs through kickbacks to the PBMs and continued formulary status without net price reductions for Lilly.

**C.    The Use of the U.S. Mails and Interstate Wire Facilities**

261.    The Lilly-PBM Insulin Pricing Enterprises engaged in and affected interstate commerce because they engage in the following activities across state boundaries: the sale, purchase and/or administration of Humalog; the setting of the prices of Humalog; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission to patients of individual prescriptions for Humalog by mail-order pharmacies; and/or the transmission and/or receipt of invoices, statements and payments related to the use or administration of Humalog. During the class period, the Lilly-PBM Insulin Pricing Enterprises participated in the administration of insulin to individuals located throughout the United States.

262.    During the class period, Lilly's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

263.    The nature and pervasiveness of the Insulin Drug Manufacturers' spread scheme, which was orchestrated out of the corporate headquarters of the Defendant Drug Manufacturers, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with the PBMs.

264.    Most of the precise dates of Lilly's uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and

- 91 -

cannot be alleged without access to Lilly's books and records. Indeed, an essential part of the successful operation of the spread scheme alleged herein depended upon secrecy, and as alleged above. And Lilly took deliberate steps to conceal wrongdoing. However, the plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the spread scheme.

265.    The Lilly-PBM Insulin Pricing Enterprises' use of the U.S. mails and interstate wire facilities to perpetrate the spread scheme involved thousands of communications throughout the class period including, *inter alia*:

a.    Marketing materials about the benchmark prices for Humalog and the available spreads, which Lilly sent to PBMs located across the country and to the State of Rhode Island;

b.    Written and oral representations of Humalog benchmark prices that Lilly made at least annually and, in many cases, several times during a single year;

c.    Thousands of written and oral communications discussing, negotiating, and confirming the placement of Lilly's Humalog on a particular PBM's formulary;

d.    Written and oral representations regarding information or incentives designed to lessen the prices that each of the PBMs paid for Humalog, and/or to conceal those prices or the spread scheme;

e.    Written communications, including checks, relating to rebates, kickbacks, or other financial inducements paid to each of the PBMs to persuade them to advocate Lilly's Humalog over a competitor's product;

f.    Written and oral communications with U.S. Government agencies and private insurers that fraudulently misrepresented what the benchmark prices were, or that

were intended to deter investigations into the true nature of the benchmark prices or to forestall changes to reimbursement based on something other than benchmark prices;

      g.      Written and oral communications with health insurers and patients;

      h.      Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of Lilly's spread scheme; and

      i.      In addition to the above-referenced RICO predicate acts, Lilly's corporate headquarters have communicated through use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the spread scheme. These mails include some of the documents referenced in this Complaint.

## D.    Conduct of the RICO Enterprises' Affairs

266.    During the class period, Lilly has exerted control over the Lilly-PBM Insulin Pricing Enterprises with which Lilly is associated with and, in violation of Section 1962(c) of RICO, Lilly has conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

      a.      Lilly has directly controlled the benchmark and net prices for its analog insulins, which determines the amount of each of the PBMs' compensation;

      b.      Lilly has directly controlled the benchmarks prices that it publicly reports;

      c.      Lilly has directly controlled the creation and distribution of marketing, sales, and other materials used to inform each of the PBMs of the profit potential of its analog insulins;

      d.      Lilly has relied upon its employees and agents to promote the spread scheme through the U.S. mails, through interstate wire facilities, and through direct contacts with providers and the PBMs; and

- 93 -

e.      Lilly has controlled and participated in the affairs of the Lilly-PBM Insulin Pricing Enterprises with which it is associated by providing rebates (as detailed above) or other inducements to place its analog insulin on a PBM's formulary or advocate the use of a certain analog insulin. These inducements include Lilly's payment to PBMs of: (i) access rebates for placement of products on the PBMs' formulary; (ii) market share rebates for garnering higher market share than established targets; (iii) administrative fees for assembling data to verify market share results; and (iv) other fees and grants. Although PBMs typically agree to share rebates in some form with clients, they link the rebates to formulary savings in such a manner that the PBM often is able to retain a significant portion of the rebates. Furthermore, PBMs usually refuse to disclose specific rebate amounts to clients in any fashion other than in the aggregate compared to performance standards, thereby preventing the client from learning the true amount of rebates that the PBM has received in connection with the health plan client.

f.      Lilly intended that the PBMs would (and did) distribute, through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates saved health care payers and consumers like the plaintiffs and class members money on their prescription needs; and

g.      Lilly represented to the general public, by stating Humalog's benchmark prices without stating that these benchmark prices differed substantially from those net prices offered to the PBMs, that Humalog's benchmark prices reflected or approximated analog insulins' true price.

267.    Each of the Lilly-PBM Insulin Pricing Enterprises identified above had a hierarchical decision-making structure headed by Lilly.

- 94 -

268.     In violation of Section 1962(c) of RICO, Lilly has conducted the affairs of each of the Lilly-PBM Insulin Pricing Enterprises with which it is associated by reporting fraudulently inflated benchmark prices for the analog insulins and by misrepresenting to plaintiffs and class members through the publication of their benchmark prices that these benchmark prices were reasonable bases for plaintiff and class member out-of-pocket payments, thereby inducing plaintiffs and class members to pay inflated amounts for Humalog.

**E.     Lilly's Pattern of Racketeering Activity**

269.     Lilly has conducted and participated in the affairs of its respective Lilly-PBM Insulin Pricing Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud. Lilly's pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of its spread schemes. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which Lilly intended to defraud plaintiffs, members of the class, and other intended victims of the spread scheme.

270.     Lilly's fraudulent and unlawful spread scheme consisted, in part, of deliberately overstating the benchmark prices for its analog insulin, thereby creating a spread between net and benchmark prices. Lilly then used those spreads to induce each of the PBMs to advocate and favor its drug.

271.     The spread scheme was calculated and crafted such that plaintiffs and members of the class would pay for the analog insulin based on the artificially inflated, benchmark prices. In designing and implementing the spread scheme, Lilly was cognizant, at all times, of the fact

- 95 -

those plaintiffs and class members were not part of the enterprise and relied upon the integrity of Lilly in setting benchmark prices.

272.    By intentionally and artificially inflating the benchmark prices, and by subsequently failing to disclose such practices to the plaintiffs and class members, Lilly engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

273.    Lilly's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive plaintiffs and members of the class. Each separate use of the U.S. mails and/or interstate wire facilities employed by Lilly was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the class. Lilly has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Lilly-PBM Insulin Pricing Enterprises with which each of them is and was associated-in-fact.

274.    Lilly's conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

275.    The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item or service for which payment may be made in whole or in part under a Federal health care program.  42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program.  "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the

- 96 -

health insurance program under Chapter 89 of Title 5); or (2) any State health care program, as

defined in section § 1320a-7(h) of this title."  42 U.S.C. § 1320a-7b(f).

276.    The purported "discounts" or "rebates" afforded by the PBMs to the

manufacturers do not fall within the (h) safe harbor.  First, they are neither "discounts" or

"rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary

treatment.  Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling

price—to the extent that the manufacturer has increased the benchmark price to make up for an

increased "rebate," all that it has done is created a widened spread from which the PBM can

make more money.  This is a classic kickback.

## F.      The Motive

277.    The motive in creating and operating the spread scheme and conducting the

affairs of the Lilly-PBM Insulin Pricing Enterprises described herein was to fraudulently obtain

sales of and profits from analog insulin.

278.    The spread scheme was designed to, and did, encourage others, including health

care providers, to advocate the use of Lilly's analog insulin. Thus, Lilly used the spread scheme

to sell more of its drugs, thereby fraudulently gaining sales, market share, and profits.

## G.      Damages Caused by the Scheme

279.    Lilly's violations of federal law and their pattern of racketeering activity have

directly and proximately caused the plaintiffs and members of the class to be injured in their

business or property. The plaintiffs and class members have paid many hundreds of millions of

dollars in inflated payments based on the fictitious benchmark prices for analog insulin.

280.    Lilly sent billing statements through the U.S. mails or by interstate wire facilities

and reported the benchmark prices and other information by the same methods in furtherance of

- 97 -

their spread scheme. The plaintiffs and members of the class have made inflated payments for the analog insulins based on and/or in reliance on reported and false benchmark prices.

281.    As previously explained, when a plaintiff or class member fills a prescription for one of the analog insulins, he/she is responsible for paying all or a portion of the medication's cost. If the plaintiff or class member is uninsured, he/she must pay 100% of the drugs' point-of-sale prices, which are based on the Insulin Drug Manufacturers' benchmark prices. If the plaintiff or class member has a high-deductible health plan, he/she must pay 100% of the drugs' point-of-sale prices, based on the Insulin Drug Manufacturers' benchmark prices, until he/she satisfies his/her deductible. If the plaintiff's or class member's health plan contains a coinsurance requirement, he/she is responsible for paying a percentage of his/her drugs' point-of-sale prices, based on the Insulin Drug Manufacturers' benchmark prices. And if the plaintiff or class member is a member of a Medicare Part D plan, his/her is responsible for paying all or a portion of his/her drugs' point-of-sale prices based on the Insulin Drug Manufacturers' benchmark prices, until he/she reaches his/her maximum contribution.

282.    The amount of each of these cash payments is based on the Insulin Drug Manufacturers' benchmark prices. Therefore, when each Insulin Drug Manufacturer artificially inflated each analog insulin's benchmark price and then used the Lilly-PBM Insulin Pricing Enterprises to sell those analog insulins, they also artificially inflate plaintiffs' and class members' out-of-pocket expenses.

283.    The plaintiffs' and class members' damages are therefore the difference between Lilly's reported benchmark prices and the net prices at which they sell analog insulin for all plaintiff and class member out-of-pocket payments.

284.     Plaintiffs' injuries, and those of the class members, were proximately caused by Lilly's racketeering activity. But for the misrepresentations that Lilly made regarding the benchmark prices of insulin and the scheme that the Lilly-PBM Insulin Pricing Enterprises employed, plaintiffs and others similarly situated would have paid less, out-of-pocket, for their analog insulins.

285.     Lilly's racketeering activity directly and proximately caused the plaintiffs' injuries. Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and out-of-pocket payments made by Medicare Part D members. Therefore, the health care payers did not suffer the out-of-pocket overcharges that are the harms alleged in this suit.

286.     Plaintiffs and class members were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Lilly's fraudulent scheme.

287.     By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Lilly is liable to plaintiffs and members of the class for three times the damages that plaintiffs and class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT TWO

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)
### BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962

288.     The plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

289.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

290.     Lilly has violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Lilly-PBM Insulin Pricing Enterprises described previously through a pattern of racketeering activity.

291.     As set forth in detail above, Lilly and the PBM conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Lilly inflated the stated benchmark prices of its analog insulins to achieve an unlawful purpose; made false or misleading statements or material omissions regarding the net prices of its analog insulins; and made false or misleading statements or material omissions regarding the existence and amount of their analog insulins' benchmark-to-net price spread. The truth about the net prices of the analog insulins as distinguished from the inflated benchmark prices would be material to a reasonable consumer.

292.     From the outset, Lilly knew, but did not disclose, that the benchmark prices it selected and published did not reflect the net prices of those products and was not a reasonable approximation of the true market prices of its analog insulins. Yet Lilly held out its benchmark prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for consumer cost-sharing obligations with respect to these medicines. Lilly substantially inflated the benchmark prices of insulin so it could offer larger spreads to the PBMs in exchange for favorable formulary positions, a kickback. Lilly knew, but did not disclose, that the benchmark-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who

- 100 -

purchased analog insulins based on benchmark price. Lilly knowingly and deliberately misled consumers regarding the pricing of the insulin.

293.     The nature of the above-described co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

294.     Lilly has and continues to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

  a.     Multiple instances of mail fraud in violation of 18 U.S.C. § 1341;

  b.     Multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and

  c.     Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952;

295.     Lilly's violations of the above federal and state laws and the effects thereof detailed above are continuing and will continue. The plaintiffs and members of the class have been injured in their property by reason of these violations: the plaintiffs and class members have made billions of dollars in payments for the analog insulins that they would not have made but for the conspiracy to violate 18 U.S.C. § 1962(c).

296.     Lilly's racketeering activity directly and proximately injured the plaintiffs and members of the class: the plaintiffs and class members substantially overpaid for their analog insulins when they paid for these medicines at the point of sale based on the defendant's benchmark prices.

297.    By virtue of these violations of 18 U.S.C. § 1962(d), Lilly is liable to plaintiffs

and the class for three times the damages the plaintiffs and class have sustained, plus the cost of

this suit, including reasonable attorneys' fees.

## FACTUAL ALLEGATIONS RELEVANT TO
## COUNTS THREE THROUGH FIFTY-FIVE

298.    The plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

299.    In addition to violating RICO, Lilly's conduct set forth above constitutes unfair

competition or unfair, unconscionable, deceptive, and/or fraudulent acts or practices in violation

of various states' consumer protection statutes.

300.    As described above, Lilly engaged in unfair, unconscionable, and deceptive

business practices prohibited by state consumer protection laws including: inflating the stated

benchmark prices of the analog insulins to achieve an unlawful purpose; making false or

misleading statements or material omissions regarding the net prices of the analog insulins;

making false or misleading statements or material omissions regarding the existence and amount

of the analog insulins' benchmark-to-net price spread; and engaging in other unconscionable,

false, misleading, or deceptive acts or practices in the conduct of trade or commerce. The truth

about the net prices of the analog insulins as distinguished from the inflated benchmark prices

would be material to a reasonable consumer.

301.    Lilly also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, unfair practices, misrepresentations, or concealment, suppression, or

omission of material facts with the intent that others rely on such concealment, suppression, or

omission, in connection with the pricing and sale of the analog insulins.

302.     From the outset, Lilly knew, but did not disclose, that the benchmark prices it selected and published did not reflect the net price. Lilly knew that the benchmark prices it selected were not reasonable approximations of the true market prices of insulin. Yet Lilly held out these benchmark prices as reasonable approximations of the true costs of the analog insulins and reasonable bases for consumer cost-sharing obligations. Lilly substantially inflated the benchmark prices of its insulin so it could offer larger spreads to the PBMs in exchange for favorable formulary positions. Lilly knew, but did not disclose, that the benchmark-to-net price spreads did not reduce the prices paid by the plaintiffs and class members who purchased its insulin based on benchmark price. Lilly knowingly and deliberately misled consumers regarding the pricing of the insulin.

303.     Furthermore, as is set forth above, the prices the plaintiffs and class members pay for insulin, based on their benchmark prices, have been skyrocketing.

304.     There is no economic or technological reason why analog insulin would have become more expensive to produce during the time period outlined above. Indeed, with technological advances and economies of scale, the per-unit cost of analog insulin should have gone down during the same time period that Lilly was drastically raising prices.

305.     Lilly was able to raise the benchmark prices of insulin because consumers with diabetes literally have no choice but to purchase and use their prescribed insulin. If they do not, they will die, and Lilly knows this. Even cutting back on insulin to save money, as is described above, can lead to serious health consequences.

306.     Lilly's conduct is also unfair, deceptive, and unlawful because it violates the Federal Anti-Kickback statutes.

- 103 -

307.     The anti-kickback statute prohibits knowing and willful solicitation, receipt, offer, or payment of remuneration to induce the purchase of any item of service for which payment may be made, in whole or in part, under a Federal health care program 42 U.S.C. § 1320a-7b(b). Pharmaceutical manufacturers may be liable under the anti-kickback statute if they offer to induce the purchase of drugs paid for by Medicare Part D or any other Federal health care program.  "Federal health care program" is defined in the anti-kickback statute as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under Chapter 89 of Title 5; or (2) any State health care program, as defined in section § 1320a-7(h) of this title."  42 U.S.C. § 1320a-7b(f).

308.     The purported "discounts" or "rebates" afforded by the PBMs to the manufacturers do not fall within the (h) safe harbor.  First, they are neither "discounts" or "rebates" alone, as they are accompanied by the quid pro quo of getting preferred formulary treatment.   Second, the "discounts" or "rebates" do not reduce the manufacturer's net selling price—to the extent that the manufacturer has just increased the benchmark price to make up for an increased "rebate" al that it has done is created a widened spread from which the PBM can make more money.  This is a classic kickback.

309.     Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[37] Unconscionable practices include

---

[37] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

performance of an agreement, in addition to inducing a purchase.[38] Charging a price far in excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the Consumer Fraud Act.[39]

310.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent, deceptive, or misleading" prohibited under the NJCFA.[40] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' *in addition to* practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[41]

311.    Lilly's actions are made all the more unfair and unconscionable by the fact that the rate of diabetes is rising in the United States, giving Lilly and PBMs more people of which to take advantage. Moreover, Lilly knows that the other manufacturers have not and will not compete based on real reductions in *net* price; they prefer to compete on inflation of *benchmark* prices. Even in the absence of collusion, it is in Lilly's individual best interest to not compete on net price reductions because doing so would lead to a price war which would upset the unconscionable profits earned by all of three.

---

[38]    *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. 2011) (citing *New Mea Construction Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

[39]    *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Group, LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equipment Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

[40]    *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[41]    *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

- 105 -

312.    By exponentially raising the benchmark prices on which consumer cost-sharing obligations are based, while offering the three largest PBMs significant lower, but secret, net prices, Lilly has engaged in unfair, unconscionable, and deceptive business practices in violation of state consumer protection laws. In the course of their business, Lilly willfully failed to disclose and actively concealed the reality that its benchmark prices are not reasonable approximations of the real prices of their analog insulins, knowing that the plaintiffs and class members pay for such insulins based on the medicines' benchmark prices. This course of conduct was both deceptive as well as unconscionable and unfair.

313.    Lilly intentionally and knowingly misrepresented material facts and/or omitted material facts regarding the true prices of the analog insulins with the intent to mislead consumers, including the plaintiffs. As alleged above, Lilly, through the Manufacturer-PBM Enterprises, made material misstatements about the prices of the analogs insulins and the existence and extent of rebates on these drugs. These misstatements and omissions were either false or misleading.

314.    Lilly owed the plaintiffs a duty to disclose the reality that the benchmark prices of the insulin were not reasonable approximations of the true costs of these medications and were not reasonable bases for the consumers' cost-sharing obligations because Lilly:

a.    Possessed knowledge about the benchmark prices of the analog insulins;

b.    Possessed exclusive, non-public, and material information regarding the net prices of the analog insulins; and

c.    Made false or incomplete representations about the prices of the analogs, while purposefully withholding material facts from the plaintiffs that contradicted these representations.

- 106 -

315.    Because Lilly fraudulently concealed the true prices of the insulin, the plaintiffs were deprived of the benefit of their bargain: they grossly overpaid for the insulin.

316.    Lilly's concealment of the insulin pricing fraud was material to the plaintiffs. Had the plaintiffs known that the net prices of insulin were much lower, they would have demanded that the benchmark prices on which their cost-sharing obligation were based be lowered as well.

317.    As a direct and proximate result of Lilly's conduct, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. As a direct and proximate result of Lilly's misconduct, all plaintiffs and class members who purchased insulin incurred damages in the amount of the difference between Lilly's reported benchmark prices and their net prices for plaintiffs and class member out-of-pocket payments.

**COUNT THREE**

**VIOLATION OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT
ALA. CODE § 8-19-1, *ET SEQ.***

318.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

319.    This claim is brought by the plaintiffs on behalf of residents of Alabama who are members of the class.

320.    The Alabama Deceptive Trade Practices Act (Alabama DTPA) declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."[42]

---

[42] Ala. Code § 8-19-5.

321.     Plaintiffs and class members are "consumers" within the meaning of Ala. Code.

§ 8-19-3(2).

322.     Plaintiffs and Defendant are "persons" within the meaning of Ala. Code § 8-19-

3(3).

323.     Defendant was and is engaged in "trade or commerce" within the meaning of Ala.

Code § 8-19-3(8).

324.     As alleged in this complaint, Lilly has made "false or misleading statement of fact

concerning the reasons for, existence of, or amounts of, price reductions"[43] with respect to its

analog insulins.

325.     Lilly's conduct, as described in this complaint, also constitutes "unconscionable,

false, misleading, [and] deceptive act or practice in the conduct of trade or commerce."[44]

326.     Pursuant to Ala. Code § 8-19-10, plaintiffs seek monetary relief against

defendants measured as the greater of (a) actual damages in an amount to be determined at trial

and (b) statutory damages in the amount of $100 for each plaintiff.

327.     Plaintiffs also seek an order enjoining Lilly's unfair, unlawful, and/or deceptive

practices, attorneys' fees, and any other just and proper relief available under Ala. Code. § 8-19-

1, *et seq.*

328.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying

with Ala. Code § 8-19-10(e) to Lilly. Because Lilly failed to remedy its unlawful conduct within

the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

---

[43] *Id.*

[44] *Id.*

- 108 -

## COUNT FOUR

### VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### ALASKA STAT. § 45.50.471, *ET SEQ.*

329.     The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

330.     This claim is brought by the plaintiffs on behalf of residents of Alaska who are members of the class.

331.     The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declares unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce," including "(8) advertising goods or services with intent not to sell them as advertised"; "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged."[45]

332.     As alleged in this complaint, Lilly has made false or misleading statements of fact concerning the prices of analog insulin, it has advertised the benchmark prices of insulins as much higher than the true average prices of these medicines, and it has employed "deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection" with its sale of insulin.

---

[45] Alaska Stat. § 45.50.471.

333.    Under Alaska Stat. § 45.50.531(a), the plaintiffs seek monetary relief measured as the greater of (a) three times the actual damages in an amount to be determined at trial and (b) $500 for each plaintiff.

334.    Under Alaska Stat. § 45.50.535(a), the plaintiffs also seek an order enjoining Lilly's unfair, unlawful, and/or deceptive practices

335.    Under Alaska Stat. § 45.50.537, the plaintiffs seek attorneys' fees and any other just and proper relief available under the Alaska CPA.

336.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Alaska Stat. § 45.50.535(b)(1). Because Lilly failed to remedy their unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

**COUNT FIVE**

**VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
ARIZONA REV. STAT. § 44-1521, *ET SEQ*.**

337.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

338.    This claim is brought by the plaintiffs on behalf of residents of Arizona who are members of the class.

339.    The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."[46]

---

[46] Ariz. Rev. Stat. § 44-1522(A).

340.     The defendant, plaintiffs, and class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

341.     Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

342.     The defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

343.     As alleged in this complaint, the defendant has employed "deception," "fraud, false pretense, false promise, misrepresentation, [and/]or concealment"[47] with respect to its analog insulins.

344.     Lilly's conduct, as described in this complaint, also constitutes "unfair act[s]."[48]

345.     Pursuant to the Arizona CFA, the plaintiffs seek monetary relief in an amount to be determined at trial. The plaintiffs also seek punitive damages because the defendant has engaged in conduct that is wanton, reckless or shows spite or ill-will[49] and/or acted with reckless indifference to the interests of others.[50]

346.     Plaintiffs also seek an order enjoining Lilly's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

---

[47] *Id.*

[48] *Id.*

[49] *See Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 577 (1974); *Lufty v. R. D. Roper & Sons Motor Co.*, 57 Ariz. 495, 115 P.2d 161 (1941)

[50] *See Sellinger*, 110 Ariz. at 577; *McNelis v. Bruce*, 90 Ariz. 261 (1961).

## COUNT SIX

### VIOLATION OF THE ARKANSAS
### DECEPTIVE TRADE PRACTICES ACT
### ARK. CODE § 4-88-101 *ET SEQ.*

347.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

348.    This claim is brought by the plaintiffs on behalf of residents of Arkansas who are members of the class.

349.    The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices,"[51] which include, but are not limited to, "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade."[52] The Arkansas DTPA also prohibits "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; . . . or (E) A similar factor."[53] The statute further bars, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission."[54]

350.    Defendant, plaintiffs, and class members are "persons" within the meaning of Ark. Code. § 4-88-102(5).

351.    Each drug at issue constitutes "goods" within the meaning of Ark. Code § 4-88-102(4).

---

[51] Ark. Code. § 4-88-107(a).

[52] *Id.* § 4-88-107(a)(10).

[53] *Id.* § 4-88-107(a)(8).

[54] *Id.* § 4-88-108.

- 112 -

352.     As alleged in this complaint, the defendant's conduct with respect to insulin constitutes both "unconscionable" and "deceptive" acts in violation of the Arkansas DTPA.

353.     Plaintiffs seek monetary relief against defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because defendant acted wantonly in causing plaintiffs' and class members' injuries or with such a conscious indifference to the consequences that malice may be inferred.

354.     Plaintiffs also seek an order enjoining defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT SEVEN

### VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT
### CAL. CIV. CODE § 1750, *ET SEQ.*

355.     The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

356.     This claim is brought by the plaintiffs on behalf of residents of California who are members of the class.

357.     The California Legal Remedies Act (CLRA) prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer,"[55] including: "Making false or misleading statement of fact concerning reasons for, existence of, or amounts of, price reductions."[56]

358.     Defendant is a "person" under Cal. Civ. Code § 1761(c).

---

[55] Cal. Civ. Code § 1770(a).

[56] *Id.* § 1770(a)(13).

359.     The plaintiffs and class members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased one or more analog insulin at issue.

360.     As alleged in this complaint, the defendant's conduct with respect to insulin constitutes both "unfair" and "deceptive" acts in violation of the CLRA.

361.     The plaintiffs seek injunctive relief under the CLRA for the defendant's violations of Cal. Civ. Code § 1770. On January 24, 2017, and January 25, 2017, the plaintiffs sent demand letters notifying Lilly of such claims for relief pursuant to Cal. Civ. Code § 1782(d). Because the Lilly failed to remedy its unlawful conduct within the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

362.     The plaintiffs also seek, under Cal. Civ. Code § 1780(a), monetary relief against Lilly for the harm its violations of the CLRA caused the plaintiffs.

363.     Under Cal. Civ. Code § 1780(b), the plaintiffs seek an additional award against defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Lilly knew or should have known that its conduct was directed to one or more plaintiffs or class members who are senior citizens or disabled persons. The defendant's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more plaintiffs or class members who are senior citizens or disabled persons are substantially more vulnerable to defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from defendant's conduct.

364.   The plaintiffs further seek an order enjoining defendant's unfair or deceptive acts

or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e),

and any other just and proper relief available under the CLRA. The plaintiffs sent letters

complying with Cal. Civ. Code § 1780(b) on January 24, 2017, and January 25, 2017 to the

defendant. Because the defendant failed to remedy its unlawful conduct within the requisite time

period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT EIGHT

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

365.   The plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

366.   This claim is brought by the plaintiffs on behalf of residents of California who are

members of the class.

367.   California Business and Professions Code § 17200 (UCL) prohibits "unlawful,

unfair, or fraudulent business acts or practices."

368.   The defendant violated the "unlawful" prong of § 17200 by its violations of the

CLRA, as described above.

369.   Defendant also violated the "fraudulent" prong of § 17200 through the pricing

fraud, as described throughout this complaint.

370.   In addition, the defendant violated the "unfair" prong of § 17200[57] because the

defendant's acts and practices described in this complaint, including artificial inflation of

---

[57] *See Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) ("A business act or practice may violate the [UCL] if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." (internal quotation marks and citation omitted)).

benchmark prices to offer large rebates to the PBMs, caused Lilly to profit at the expense of consumers.

371.    The California courts have set out several definitions of unfairness. Lilly's conduct is unfair under each of them:

      a.    "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."[58]

      b.    Lilly's conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[59]

      c.    The plaintiffs' claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."[60]

372.    The defendant's actions, as set forth above, occurred within the conduct of its business and in trade or commerce.

373.    Pursuant to Cal. Bus. & Prof. Code § 17203, the Court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute.

374.    Plaintiffs request that this Court enter such orders or judgments as may be necessary, including: a declaratory judgment that defendant has violated the UCL; an order

---

[58] *See Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 839 (2006).

[59] *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806 (2013) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001)).

[60] *See West*, 214 Cal. App. at 806 (quoting *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003)).

enjoining the defendant from continuing its unfair, unlawful and/or fraudulent trade practices; an

order restoring to the plaintiffs any money lost as result of defendant's unfair, unlawful, and/or

fraudulent trade practices, including restitution and disgorgement of any profits the defendant

received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. &

Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other

relief as may be just and proper.

375.    In addition, under Cal. Civ. Proc. Code § 1021.5, the Court "may award

attorneys' fees to a successful party against one or more opposing parties in any action which has

resulted in the enforcement of an important right affecting the public interest if: (a) a significant

benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large

class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to

make the award appropriate, and (c) such fees should not in the interest of justice be paid out of

the recovery, if any."

**COUNT NINE**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
COLO. REV. STAT. § 6-1-101, *ET SEQ.***

376.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

377.    This claim is brought by plaintiffs on behalf of residents of Colorado who are

members of the class.

378.    The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive

practices in the course of a person's business including, but not limited to: "Advertis[ing] goods,

services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading

statements of fact concerning the price of goods, services, or property or the reasons for,

- 117 -

existence of, or amounts of price reductions;" and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."[61]

379.    Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

380.    Plaintiffs and class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

381.    Defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

382.    As alleged in this complaint, the defendant's conduct with respect to insulin constitutes: "Advertis[ing] goods, services, or property with intent not to sell them as advertised"; "Mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;" and "Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction"[62] in violation of the Colorado CPA.

383.    Under Colo. Rev. Stat. § 6-1-113, plaintiffs seek monetary relief against defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages and (b) statutory damages in the amount of $500 for each plaintiff or class member.

---

[61] Colo. Rev. Stat. § 6-1-105(1).

[62] *Id.*

384.     Plaintiffs also seek an order enjoining defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT TEN

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT CONN. GEN. STAT. § 42-110A, *ET SEQ.*

385.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

386.     This claim is brought by the plaintiffs on behalf of residents of Connecticut who are members of the class.

387.     The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[63]

388.     Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

389.     Defendant's challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

390.     As alleged in this complaint, the defendant's conduct with respect to insulin constitutes both and "unfair" and "deceptive" acts in violation of the Connecticut UTPA.

391.     Plaintiffs and class members are entitled to recover its actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

392.     Lilly acted with reckless indifference to another's rights or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly

---

[63] Conn. Gen. Stat. § 42-110b(a).

- 119 -

aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

## COUNT ELEVEN

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
## DEL. CODE TIT. 6, § 2513, *ET SEQ.*

393.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

394.    This claim is brought by plaintiffs on behalf of residents of Delaware who are members of the class.

395.    The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."[64]

396.    Defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

397.    The defendant's actions, as set forth above, occurred in the conduct of trade or commerce.

398.    As alleged in this complaint, the defendant's conduct with respect to insulin violated the Delaware CFA.

399.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of defendant's unlawful conduct.[65] Plaintiffs also seek an order

---

[64] Del. Code tit. 6, § 2513(a).

[65] *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).

enjoining defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

400.    Lilly has engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT TWELVE

### VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT
### D.C. CODE § 28-3901, *ET SEQ.*

401.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

402.    This claim is brought by the plaintiffs on behalf of residents of the District of Columbia who are members of the class.

403.    The Consumer Protection Procedures Act (District of Columbia CPPA) states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*: "(f) fail to state a material fact if such failure tends to mislead"; "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead"; "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time"; or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."[66]

404.    Defendant is a "person" under D.C. Code § 28-3901(a)(1).

405.    Plaintiffs and class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased insulin at issue.

---

[66] D.C. Code § 28-3904.

406.    Defendant's actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901.

407.    As alleged in this complaint, defendant's conduct with respect to insulin: "fail[ed] to state a material fact"—the true cost of insulin—and that "failure tended to mislead"; "[u]se[d] innuendo or ambiguity as to a material fact, which ha[d] a tendency to mislead"; "ma[d]e false or misleading representations of fact concerning the reasons for, existence of, [and/or] amounts of price reductions, or the price in comparison to price of . . . [its] own price at a past or future time"; and "falsely state[d] the reasons for offering or supplying goods or services at sale or discount prices."[67]

408.    Plaintiffs and class members are entitled to recover: treble damages or $1,500, whichever is greater; punitive damages; reasonable attorneys' fees; and any other relief the Court deems proper under D.C. Code § 28-3901.

409.    Plaintiffs seek punitive damages against Lilly because the conduct evidences malice and/or egregious conduct.

## COUNT THIRTEEN

### VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### FLA. STAT. § 501.201, *ET SEQ.*

410.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

411.    This claim is brought by the plaintiffs on behalf of residents of Florida who are members of the class.

---

[67] *Id.*

412.     The Florida Unfair and Deceptive Trade Practices Act (FUDTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."[68]

413.     In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.[69] The Legislature specifically stated that a violation of FUDTPA "may be based upon . . . [t]he standards of unfairness . . . set forth and interpreted by the Federal Trade Commission or the federal courts."[70]

414.     The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the FUDTPA.

415.     In addition, defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the FUDTPA.[71]

416.     Plaintiffs and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

417.     Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

418.     The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FUDTPA may recover actual damages, plus attorneys' fees and court

---

[68] Fla. Stat. § 501.204(1).

[69] *Id.* § 501.204(2).

[70] *Id.* § 501.203(3)(b).

[71] *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (defining an "unfair practice" under the FDUTPA as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and noting a separate definition for "deception" (internal quotation marks and citation omitted)).

- 123 -

costs, all of which the plaintiffs seek in this action. Plaintiffs are entitled to recover its actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

419.    FUDTPA provides that "[a]nyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."[72] Plaintiffs seek an order enjoining defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the FUDTPA.

**COUNT FOURTEEN**

**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
GA. CODE § 10-1-390, *ET SEQ.***

420.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

421.    This claim is brought by the plaintiffs on behalf of residents of Georgia who are members of the class.

422.    The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.[73] Such acts include, but are not limited to: "[a]dvertising goods or services with intent not to sell them as advertised"; and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[74]

---

[72] Fla. Stat. § 501.211(1).

[73] Ga. Code. Ann. § 101-393(a).

[74] *Id.* § 10-1-393(b).

- 124 -

423.    Plaintiffs and class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-393(b).

424.    Defendant engaged in "trade or commerce" within the meaning of Ga. Code. Ann. § 10-1-393(b).

425.    As alleged in this complaint, defendant's conduct with respect to insulin constitutes "[a]dvertising goods or services with intent not to sell them as advertised" and "[m]aking false or misleading statements concerning the reasons for, existence of, or amounts of price reductions."[75]

426.    Plaintiffs are entitled to recover damages and exemplary damages (for intentional violations) under Ga. Code. Ann. § 10-1-399(a).

427.    Plaintiffs also seek an order: enjoining defendant's unfair, unlawful, and/or deceptive practices; attorneys' fees; and any other just and proper relief available under the Georgia FBPA.

428.    On January 24 and 25, 2017, certain plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b) to defendant.

### COUNT FIFTEEN

### VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT GA. CODE. ANN § 10-1-370, *ET SEQ.*

429.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

430.    This claim is brought by the plaintiffs on behalf of residents of Georgia who are members of the class.

---

[75] *Id.*

431. Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include: "Mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[76]

432. The defendant, plaintiffs, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

433. As alleged in this complaint, defendant's conduct with respect to insulin constitutes making "false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in . . .conduct which similarly creates a likelihood of confusion or of misunderstanding."[77]

434. Plaintiffs seek an order that enjoins defendant's unfair, unlawful, and/or deceptive practices, awards attorneys' fees, and awards any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT SIXTEEN

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### HAW. REV. STAT. § 480, *ET SEQ.*

435. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

436. This claim is brought by the plaintiffs on behalf of residents of Hawaii who are members of the class.

437. Hawaii Rev. Stat. § 480-2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

---

[76] Ga. Code. Ann § 10-1-372(a).

[77] *Id.*

- 126 -

438.     Defendant is a "person" under Haw. Rev. Stat. § 480-1.

439.     Plaintiffs and class members are "consumer[s]," as defined by Haw. Rev. Stat. § 480-1, who purchased the insulin at issue.

440.     As alleged in this complaint, defendant's conduct with respect to insulin constitutes both "unfair" and "deceptive" acts under Hawaii Rev. Stat. § 480-2.[78]

441.     Pursuant to Haw. Rev. Stat. § 480-13, the plaintiffs seek monetary relief against defendant measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

442.     Under Haw. Rev. Stat. § 480-13.5, the plaintiffs seek an additional award of up to $10,000 for each violation directed at a Hawaii elder. Lilly knew or should have known that its conduct was directed to one or more plaintiffs who are elders. Defendant's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from defendant's conduct.

## COUNT SEVENTEEN

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### IDAHO CODE § 48-601, *ET SEQ.*

443.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

---

[78] *Id.*

- 127 -

444.    This claim is brought by the plaintiffs on behalf of residents of Idaho who are members of the class.

445.    The Idaho Consumer Protection Act (Idaho CPA) prohibits "unfair or deceptive acts or practices, including, but not limited to: "(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer"; or "(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce."[79]

446.    Defendant is a "person" under Idaho Code Ann. § 48-602(1).

447.    Defendant's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

448.    As alleged in this complaint, defendant's conduct with respect to insulin constitutes both "unfair" and "deceptive" acts under the Idaho CPA.[80]

449.    Under Idaho Code § 48-608, the plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

450.    Plaintiffs also seek an order enjoining defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

451.    Plaintiffs also seek punitive damages because defendant's conduct evidences an extreme deviation from reasonable standards. The defendant flagrantly, maliciously, and

---

[79] Idaho Code Ann. § 48-603.

[80] *Id.*

fraudulently misrepresented the actual cost of its analog insulin and the existence, purpose, and amount of the rebates granted to the PBMs. They concealed facts that only they knew. Defendant's unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

## COUNT EIGHTEEN

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILL. COMP. STAT. § 505/1, *ET SEQ*., & § 295/1A

452.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

453.     This claim is brought by the plaintiffs on behalf of residents of Illinois who are members of the class.

454.     The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."[81]

455.     That section also provides: "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."[82]

456.     Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

---

[81] 815 Ill. Comp. Stat. § 505/2.

[82] *Id*.

457.    Plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

458.    Defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the ICFA.

459.    In addition, defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the ICFA.[83]

460.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . . ."[84] Pursuant to this provision of the code, the plaintiffs seek monetary relief in the amount of actual damages, as well as punitive damages because defendant acted with fraud and/or malice and/or was grossly negligent.

461.    Plaintiffs also seek an order enjoining defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## COUNT NINETEEN

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
## IND. CODE § 24-5-0.5-3

462.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

---

[83] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (stating that "[a] plaintiff is entitled to recovery under ICFA when there is unfair or deceptive conduct" and "may allege that conduct is unfair . . . without alleging that the conduct is deceptive").

[84] 815 Ill. Comp. Stat. § 505/10a.

- 130 -

463.    This claim is brought by the plaintiffs on behalf of residents of Indiana who are members of the class.

464.    Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a supplier from committing "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."[85] Such acts and practices include, but not limited to, representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not."[86]

465.    Defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

466.    Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

467.    Defendant's conduct, as described in this complaint, constitutes "deceptive acts" as well as "unfair" acts in violation of the Indiana DCSA.

468.    Under Ind. Code § 24-5-0.5-4, the plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for defendant's willfully deceptive acts.

469.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of defendant's conduct.

470.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Ind. Code § 24-5-0.5-5(a) to defendant. Because defendant failed to remedy its unlawful

---

[85] Ind. Code § 24-5-0.5-3(a).

[86] *Id.* § 24-5-0.5-3(b).

conduct within the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT TWENTY

### VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### IOWA CODE § 714H.1, *ET SEQ.*

471.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

472.     This claim is brought by the plaintiffs on behalf of residents of Iowa who are members of the class.

473.     The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."[87]

474.     Defendant is a "person" under Iowa Code § 714H.2(7).

475.     Plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased the insulin.

476.     Defendant's conduct, as described in this complaint, constitutes "deceptive" practices as well as "unfair" practices in violation of the Iowa CFA.

477.     Pursuant to Iowa Code § 714H.5, the plaintiffs seek: an order enjoining defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up

---

[87] Iowa Code § 714H.3.1.

to three times the amount of actual damages awarded as a result of defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

478.    Furthermore, pursuant to Iowa Code § 714H.7, the plaintiffs have obtained the permission of the Iowa Attorney General to file this Complaint because it is "materially the same" as the original complaint filed in New Jersey, for which the plaintiffs obtained permission to file.

## COUNT TWENTY-ONE

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
### KAN. STAT. § 50-623, *ET SEQ.*

479.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

480.    This claim is brought by the plaintiffs on behalf of residents of Kansas who are members of the class.

481.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[88] Deceptive acts or practices include, but are not limited to: "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact"; "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"; and "making false or misleading representations, knowingly or with reason to

---

[88] Kan. Stat. § 50-626(a).

know, of fact concerning the reason for, existence of or amounts of price reductions."[89] These act

constitute deceptive conduct "whether or not any consumer has in fact been misled."[90]

486. Plaintiffs and class members are "consumers," within the meaning of Kan. Stat.

Ann. § 50-624(b), who purchased the insulin.

483. The sale of insulin to plaintiffs was a "consumer transaction" within the meaning

of Kan. Stat. Ann. § 50-624(c).

484. Defendant's conduct, as described in this complaint, constitutes "deceptive"

practices in violation of the Kansas CPA.

485. Under Kan. Stat. Ann. § 50-634, the plaintiffs seek monetary relief measured as

the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages

in the amount of $10,000 for each plaintiff.

486. Plaintiffs also seek an order enjoining defendant's unfair, unlawful, and/or

deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief

available under Kan. Stat. Ann. § 50-623, *et seq.*

**COUNT TWENTY-TWO**

**VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT
KY. REV. STAT. § 367.110, *ET SEQ*.**

487. Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

488. This claim is brought by the plaintiffs on behalf of residents of Kentucky who are

members of the class.

---

[89] *Id.* § 50-626(b).

[90] *Id.*

489.    The Kentucky Consumer Protection Act (Kentucky CPA) makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."[91] The statute further construed the word "unfair" as unconscionable conduct.[92]

490.    The defendant, plaintiffs, and class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

491.    Defendant engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

492.    Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unconscionable" practices in violation of the Kentucky CPA.

493.    Pursuant to Ky. Rev. Stat. § 367.220, the plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Ky. Rev. Stat. § 367.220.

## COUNT TWENTY-THREE

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW LA. REV. STAT. § 51:1401, *ET SEQ.*

494.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

495.    This claim is brought by the plaintiffs on behalf of residents of Louisiana who are members of the class.

---

[91] Ky. Rev. Stat. § 367.170(1).

[92] *Id.* § 367.170(2).

496.    The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."[93]

497.    The defendant, plaintiffs, and class members are "persons" within the meaning of La. Rev. Stat. § 51:1402(8).

498.    Plaintiffs and class members are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

499.    Defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

500.    Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" practices in violation of the Louisiana CPL.

501.    Pursuant to La. Rev. Stat. § 51:1409, plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for knowing violations of the Louisiana CPL; an order enjoining defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT TWENTY-FOUR

### VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*

502.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

503.    This claim is brought by the plaintiffs on behalf of residents of Maine who are members of the class.

---

[93] La. Rev. Stat. § 51:1405(A).

- 136 -

504.     The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[94]

505.     The defendant, plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

506.     The defendant is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

507.     Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maine UTPA.

508.     Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, plaintiffs seek an order enjoining defendant's unfair and/or deceptive acts or practices.

509.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to defendant. Because the defendant failed to remedy its unlawful conduct within the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT TWENTY-FIVE

### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### MD. CODE, COM. LAW § 13-101, *ET SEQ.*

510.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

511.     This claim is brought by plaintiffs on behalf of residents of Maryland who are members of the class.

---

[94] Me. Rev. Stat. tit. 5, § 207.

512.     The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice, including: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; "Failure to state a material fact if the failure deceives or tends to deceive"; "False or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction"; and "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same."[95] The statute further provides that a person may not engage in such conduct regardless of whether the consumer is actually deceived or damaged.[96]

513.     Defendant, plaintiffs, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

514.     Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Maryland CPA.

515.     Pursuant to Md. Code, Com. Law § 13-408, plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT TWENTY-SIX

### VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*

516.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

---

[95] Md. Code, Com. Law § 13-301.

[96] *Id.* § 13-302.

517.    This claim is brought by the plaintiffs on behalf of residents of Massachusetts who are members of the class.

518.    Massachusetts law (the Massachusetts Act) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[97]

519.    The defendant, plaintiffs, and class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

520.    Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

521.    Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Massachusetts Act.

522.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, the plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because defendant's conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

523.    Plaintiffs also seek an order enjoining defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

524.    On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Mass. Gen. Laws ch. 93A, § 9(3) to defendant. Because defendant failed to remedy its unlawful conduct within the requisite time period, plaintiffs seek all damages and relief to which they are entitled.

---

[97] Mass. Gen. Laws ch. 93A, § 2.

## COUNT TWENTY-SEVEN

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### MICH. COMP. LAWS § 445.903, *ET SEQ.*

525.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

526.    This claim is brought by the plaintiffs on behalf of residents of Michigan who are members of the class.

527.    The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[98]

528.    Plaintiffs and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

529.    Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

530.    Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Michigan CPA.

---

[98] Mich. Comp. Laws § 445.903(1).

531.    Plaintiffs seek: injunctive relief to prevent its continuing unfair and deceptive acts; monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

532.    Plaintiffs also seek punitive damages because defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendant maliciously and egregiously misrepresented the actual price of its analog insulins, inflated benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase its profits at the expense of consumers. Lilly manipulated the price of its life-saving products without regard to the impact of its scheme on consumers' ability to afford a life-saving product. Defendant's conduct constitutes malice, oppression, and fraud, warranting punitive damages.

**COUNT TWENTY-EIGHT**

**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**MINN. STAT. § 325F.68, *ET SEQ*.**

533.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

534.    This claim is brought by the plaintiffs on behalf of residents of Minnesota who are members of the class.

535.    The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely

- 141 -

thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."[99]

536.    Each purchase of analog insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

537.    Defendant's conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota CFA.

538.    Pursuant to Minn. Stat. § 8.31(3a), the plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

539.    Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT TWENTY-NINE

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT MINN. STAT. § 325D.43-48, *ET SEQ.*

540.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

541.    This claim is brought by the plaintiffs on behalf of residents of Minnesota who are members of the class.

542.    The Minnesota Deceptive Trade Practices Act (Minnesota DTPA) prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."[100]

---

[99] Minn. Stat. § 325F.69(1).

[100] Minn. Stat. § 325D.44.

- 142 -

543.     Defendant's conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Minnesota DTPA.

544.     Pursuant to Minn. Stat. § 8.31(3a), the plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

545.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that defendant's acts showed deliberate disregard for the rights or safety of others.

## COUNT THIRTY

### VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT
### MISS. CODE. § 75-24-1, *ET SEQ*.

546.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

547.     This claim is brought by the plaintiffs on behalf of residents of Mississippi who are members of the class.

548.     The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce."[101] Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions."[102]

549.     Defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Mississippi CPA.

550.     Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

---

[101] Miss. Code Ann. § 75-24-5(1).

[102] *Id.* § 75-24-5(2).

010646-11 1023320 V1

## COUNT THIRTY-ONE

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
## MO. REV. STAT. § 407.010, *ET SEQ.*

551.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

552.    This claim is brought by the plaintiffs on behalf of residents of Missouri who are members of the class.

553.    The Missouri Merchandising Practices Act (Missouri MPA) makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."[103]

554.    The defendant, plaintiffs, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

555.    The defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

556.    The defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Missouri MPA.

557.    Lilly is liable to the plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

---

[103] Mo. Rev. Stat. § 407.020.1.

## COUNT THIRTY-TWO

## VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 MONT. CODE ANN. § 30-14-101, *ET SEQ.*

558.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

559.     This claim is brought by the plaintiffs on behalf of residents of Montana who are members of the class.

560.     The Montana Unfair Trade Practices and Consumer Protection Act (Montana CPA) makes unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[104]

561.     The defendant, plaintiffs, and class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

562.     The plaintiffs and class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

563.     The sale of each drug at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

564.     The defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the Montana CPA.

565.     Because the defendant's unlawful methods, acts, and practices have caused the plaintiffs to suffer an ascertainable loss of money and property, the plaintiffs seek from

---

[104] Mont. Code Ann. § 30-14-103.

- 145 -

defendant the greater of actual damages or $500. The plaintiffs further seek to treble their actual

damages under Mont. Code Ann. § 30-14-133.

566.    The plaintiffs also seek reasonable attorneys' fees under Mont. Code Ann. § 30-

14-133.

567.    Finally, the plaintiffs seek an order enjoining defendant's unfair, unlawful, and/or

deceptive practices, and any other relief the Court considers necessary or proper under Mont.

Code Ann. § 30-14-133.

## COUNT THIRTY-THREE

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### NEB. REV. STAT. § 59-1601, *ET SEQ.*

568.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

569.    This claim is brought by the plaintiffs on behalf of residents of Nebraska who are

members of the class.

570.    The Nebraska Consumer Protection Act (Nebraska CPA) prohibits "unfair or

deceptive acts or practices in the conduct of any trade or commerce."[105]

571.    The defendant, plaintiffs, and class members are "person[s]" under Neb. Rev.

Stat. § 59-1601(1).

572.    The defendant's actions as set forth herein occurred in the conduct of trade or

commerce as defined under Neb. Rev. Stat. § 59-1601(2).

573.    The defendant's conduct, as described in this complaint, constitutes both

"deceptive" and "unfair" acts or practices in violation of the Nebraska CPA.

---

[105] Neb. Rev. Stat. § 59-1602.

574.    Because the defendant's conduct caused injury to the plaintiffs' property through violations of the Nebraska CPA, the plaintiffs seek recovery of: actual damages, as well as enhanced damages up to $1,000; an order enjoining defendant's unfair or deceptive acts and practices; costs of Court; reasonable attorneys' fees; and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT THIRTY-FOUR

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT NEV. REV. STAT. § 598.0903, *ET SEQ.*

575.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

576.    This claim is brought by the plaintiffs on behalf of residents of Nevada who are members of the class.

577.    The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions"[106]; "[k]nowingly makes any other false representation in a transaction"[107]; "[f]ails to disclose a material fact in connection with the sale or lease of goods or services"[108]; and/or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless,

---

[106] Nev. Rev. Stat. § 598.0915.

[107] *Id.*

[108] *Id.* § 598.0923,

at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."[109]

578.    The defendant's conduct, as described in this complaint, constitutes "deceptive" acts or practices in violation of the Nevada CTPA.

579.    The plaintiffs seek their actual damages, punitive damages, an order enjoining the defendant's deceptive acts or practices, costs of Court, attorneys' fees, and all other appropriate and available remedies under Nev. Rev. Stat. § 41.600.

**COUNT THIRTY-FIVE**

**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
N.H. REV. STAT. § 358-A:1, *ET SEQ*.**

580.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

581.    This claim is brought by the plaintiffs on behalf of residents of New Hampshire who are members of the class.

582.    The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, but not limited to: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and/or "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition."[110]

583.    The defendant, plaintiffs, and class members are "persons" under N.H. Rev. Stat. § 358-A:1.

---

[109] *Id.* § 598.0925.

[110] N.H. Rev. Stat. § 358-A:2.

- 148 -

584.    The defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. § 358-A:1.

585.    The defendant's conduct, as described in this complaint, constitutes both "deceptive" and "unfair" acts or practices in violation of the New Hampshire CPA.

586.    Because the defendant's willful conduct caused injury to the plaintiffs' property through violations of the New Hampshire CPA, the plaintiffs seek recovery of: actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. § 358-A:10.

## COUNT THIRTY-SIX

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### N.J. STAT. ANN. § 56:8-1, *ET SEQ.*
### (AGAINST ELI LILLY)

587.    The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

588.    This claim is brought by the plaintiffs on behalf of residents of New Jersey who are members of the class.

589.    New Jersey "has a powerful incentive to ensure that local merchants deal fairly with citizens of other states and countries"[111] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[112] Furthermore, New Jersey has some

---

[111] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[112] *Kalow & Springut LLP v. Commence Corp.*, No. 07-3442 (JEI/AMD), 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, No. 04-2152, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

- 149 -

of the "strongest consumer protection laws in the nation."[113] Therefore, although other states may have some interest in protecting their own consumers, that interest is not frustrated by the application of New Jersey's law. "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[114]

590.    The New Jersey Consumer Fraud Act (NJCFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."[115]

591.    Unconscionability "is an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term 'unconscionable' implies is a lack of good faith, honesty in fact and observance of fair dealing."[116] Unconscionable practices include performance of an agreement, in addition to inducing a purchase.[117] Charging a price far in

---

[113] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15 (1994).

[114] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the NJCFA).

[115] N.J. Stat. Ann. § 56:8-2.

[116] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994) (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)).

[117] *Pollitt v. DRS Towing LLC*, No. 10-1285 (AET), 2011 WL 1466378, at *7 (D.N.J. 2011) (citing *New Mea Construction Corp. v. Harper*, 203 N.J. Super. 486, 501 (App. Div. 1985)).

excess of the seller's costs, combined with taking advantage of an unfair situation, is an unconscionable practice contrary to the NJCFA.[118]

592.    As the Third Circuit recently recognized, "unfair" and "unconscionable" business practices are "a category of business practices entirely separate from practices that are fraudulent, deceptive, or misleading" prohibited under the NJCFA.[119] The NJCFA "prohibit[s] business practices that are 'unfair' or 'unconscionable' in addition to practices that are fraudulent, deceptive, or misleading; these terms are defined separately and differently in the text of the statutes and in relevant case law interpreting them."[120]

593.    The defendant and plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

594.    The defendant engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

595.    The defendant's unconscionable and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the plaintiffs, about the true price of Humalog.

596.    The defendant knew, or should have known, that its conduct violated the NJCFA.

597.    As a direct and proximate result of the defendant's violations of the NJCFA, the plaintiffs and class members have suffered injury-in-fact and/or actual damages. This wrongful

---

[118] *Kugler v. Romain*, 58 N.J. 522, 542-45 (1971); *In re Nat'l Credit Mgt. Group, LLC*, 21 F. Supp. 2d 424, 452-53 (D.N.J. 1998); *In re Fleet*, 95 B.R. 319, 336 (E.D. Pa. 1989); *Pro v. Hertz Equipment Rental*, No. 06-cv-03830, 2012 WL 12906183 (D.N.J. June 25, 2012).

[119] *Cottrell v. Alcon Labs.*, 874 F.3d 154, 165 (3d Cir. 2017).

[120] *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (explaining that an unconscionable practice can qualify as unlawful under the NJCFA, "even if no person was in fact misled or deceived thereby").

- 151 -

conduct by the defendant, coupled with the damage the plaintiffs and class members incurred, entitles members of the class to relief under the NJCFA.

598.     Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . ."[121] "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, . . . the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."[122] Therefore, the plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT THIRTY-SEVEN

## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### N.M. STAT. § 57-12-1, *ET SEQ.*

599.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

600.     This claim is brought by the plaintiffs on behalf of residents of New Mexico who are members of the class.

601.     The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services .

---

[121] N.J. Stat. Ann. § 56:8-19.

[122] *Id.*

. . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to: "making false or misleading statements of fact concerning the price of goods or services, the prices of competitors or one's own price at a past or future time or the reasons for, existence of or amounts of price reduction"; "making false or misleading statements of fact for the purpose of obtaining appointments for the demonstration, exhibition or other sales presentation of goods or services"; and/or "failing to state a material fact if doing so deceives or tends to deceive."[123]

602.    The New Mexico UTPA further makes unlawful "unconscionable trade practice[s]," meaning "an act or practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods or services, . . . that to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."[124]

603.    The defendant, plaintiffs, and class members are "person[s]" under N.M. Stat. § 57-12-2.

604.    The defendant's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. § 57-12-2.

605.    The defendant's conduct, as described in this complaint, constitutes a pattern of "false or misleading oral or written statement[s]" in violation of N.M. Stat. Ann. § 57-12-2(D).

606.    The defendant's conduct, as described in this complaint, also constitutes a pattern of "unconscionable trade practice[s]" in violation of N.M. Stat. Ann. § 57-12-2(E).

---

[123] N.M. Stat. Ann. § 57-12-2(D).

[124] *Id.* § 57-12-2(E).

607.     Because the defendant's false, unconscionable, and willful conduct caused actual harm to the plaintiffs, the plaintiffs seek recovery of: actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. Stat. § 57-12-10.

## COUNT THIRTY-EIGHT

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### N.Y. GEN. BUS. LAW §§ 349-350

608.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

609.     This claim is brought by the plaintiffs on behalf of residents of New York who are members of the class.

610.     The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[125]

611.     The plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

612.     Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

613.     The defendant's conduct, as described in this complaint, constitutes deceptive acts in violation of the New York GBL.

614.     The defendant's deceptive acts and practices, which were intended to mislead consumers who purchased analog insulin, constitutes conduct directed at consumers.

615.     Because the defendant's willful and knowing conduct caused injury to the plaintiffs, the plaintiffs seek recovery of: actual damages or $50, whichever is greater;

---

[125] N.Y. Gen. Bus. Law § 349.

discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining defendant's deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT THIRTY-NINE

### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

616.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

617.    This claim is brought by the plaintiffs on behalf of residents of North Carolina who are members of the class.

618.    North Carolina's Unfair and Deceptive Acts and Practices Act (NCUDTPA) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."[126]

619.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the NCUDTPA.

620.    In addition, the defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the NCUDTPA.[127]

621.    Defendant has engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

---

[126] N.C. Gen. Stat. § 75-1.1(a).

[127] *Melton v. Family First Mortg. Corp.*, 576 S.E.2d 365, 368 (2003) ("A practice is unfair [under the NCUDTPA] when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" and offering a separate definition for "deceptive" practices (internal quotation marks and citations omitted)).

- 155 -

622.     Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."[128]

623.     The plaintiffs seek an order trebling their actual damages, an order enjoining Defendant's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under N.C. Gen. Stat. § 75-16.

### COUNT FORTY

### VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### N.D. CENT. CODE § 51-15-02

624.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

625.     This claim is brought by the plaintiffs on behalf of residents of North Dakota who are members of the class.

626.     The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful the "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice."[129] The statute further

---

[128] N.C.G.A. § 75-16.

[129] N.D. Cent. Code § 51-15-02.

provide that the "act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."[130]

627.    The defendant, plaintiffs, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

628.    The defendant's engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

629.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the North Dakota CFA.

630.    In addition, the defendant's conduct, as described in this complaint, constitutes "unconscionable conduct" acts in violation of the North Dakota CFA.

631.    Defendant knowingly committed the conduct described above. As a result, under N.D. Cent. Code § 51-15-09, the defendant is liable to the plaintiffs for treble damages in amounts to be proven at trial, attorneys' fees, costs, and disbursements. The plaintiffs further seek an order enjoining unfair and/or deceptive acts or practices as well as other just and proper available relief under the North Dakota CFA.

## COUNT FORTY-ONE

### VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
### OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*

632.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

---

[130] *Id.*

- 157 -

633.   This claim is brought by the plaintiffs on behalf of residents of Ohio who are members of the class.

634.   Ohio Consumer Sales Practices Act (Ohio CSPA) broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."[131] Specifically, and without limitation on the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not."[132]

635.   Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

636.   The plaintiffs and class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D).

637.   The plaintiffs' purchases of analog insulins are "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

638.   The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Ohio CSPA.

639.   In addition, the defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the Ohio CSPA.

640.   As a result of the defendant's wrongful conduct, the plaintiffs have been damaged in an amount to be proven at trial. They seek all just and proper remedies, including, but not limited to: actual and statutory damages, an order enjoining defendant's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

---

[131] Ohio Rev. Code Ann. § 1345.02.

[132] *Id.*

**COUNT FORTY-TWO**

**VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
OKLA. STAT. TIT. 15, § 751, *ET SEQ.***

641.     Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

642.     This claim is brought by the plaintiffs on behalf of residents of Oklahoma who are

members of the class.

643.     The Oklahoma Consumer Protection Act (Oklahoma CPA) declares unlawful,

*inter alia*, the following acts or practices when committed in the course of business: making

"false or misleading statements of fact, knowingly or with reason to know, concerning the price

of the subject of a consumer transaction or the reason for, existence of, or amounts of price

reduction"[133] and/or "any practice which offends established public policy or if the practice is

immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."[134]

644.     The Oklahoma CPA further provides that if "[t]he commission of any act or

practice declared to be a violation of the Consumer Protection Act" "is also found to be

unconscionable," the violator is liable to the aggrieved customer for the payment of a civil

penalty, recoverable in an individual action only, in a sum set by the court of not more than Two

Thousand Dollars ($2,000.00) for each violation."[135] "In determining whether an act or practice

is unconscionable the following circumstances shall be taken into consideration by the court: (1)

whether the violator knowingly or with reason to know, took advantage of a consumer

reasonably unable to protect his or her interests because of his or her age, physical infirmity,

---

[133] Okla. Stat. tit. 15, § 753.

[134] *Id.* § 752.

[135] *Id.* § 761.1.

ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) whether, at the time the consumer transaction was entered into, the violator knew or had reason to know that price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers; . . . [and] (4) whether the violator knew or had reason to know that the transaction he or she induced the consumer to enter into was excessively one-sided in favor of the violator."[136]

645.     The plaintiffs and class members are "persons" under Okla. Stat. tit. 15, § 752.

646.     Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

647.     The sale of insulin to the plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and defendant's actions as set forth herein occurred in the conduct of trade or commerce.

648.     The defendant's conduct, as described in this complaint, constitutes "false or misleading statements" in violation of the Oklahoma CPA. The defendant's conduct, as described in this complaint, further constitutes practices that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers in violation of the Oklahoma CPA.

649.     The defendant's conduct as alleged herein was also unconscionable because (1) the defendant, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) the defendant knew or had reason to know that benchmark prices grossly exceeded the prices at which similar property or services were readily obtainable in similar transactions by like consumers; and (3) the

---

[136] *Id.*

defendant knew or had reason to know that the transactions it induced the consumers to enter were excessively one-sided in favor of defendant.

650.    The plaintiffs seek punitive damages because the defendant's conduct was egregious. The defendant misrepresented the actual prices of insulin, inflated benchmark prices, and concealed the reasons for and amount of the rebates offered to PBMs to increase profits at the expense of consumers. Lilly manipulated the prices of life-saving insulin without regard to the impact of the scheme on consumers' ability to afford this life-saving drug. Defendant's egregious conduct warrants punitive damages.

651.    Furthermore, because defendant's unconscionable conduct caused injury to plaintiffs, plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees under Okla. Stat. tit. 15, § 761.1. The plaintiffs further seek an order enjoining defendant's unfair and/or deceptive acts or practices and any other just and proper relief available under the Oklahoma CPA.

## COUNT FORTY-THREE

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### OR. REV. STAT. § 646.605, *ET SEQ.*

652.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

653.    This claim is brought by the plaintiffs on behalf of residents of Oregon who are members of the class.

654.    The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business: making "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions"; making "false or

misleading representations of fact concerning the offering price of, or the person's cost for . . . goods"; or engaging "in any other unfair or deceptive conduct in trade or commerce."[137]

655.    Defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

656.    Each analog insulin at issue is a "good" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

657.    The defendant's conduct, as described in this complaint, constitutes "false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions" on the analog insulins; "false or misleading representations of fact concerning the offering price of, or the person's cost for" the analog insulins; and "unfair or deceptive conduct."[138]

658.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs are also entitled to punitive damages because defendant engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

## COUNT FORTY-FOUR

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 PA. CONS. STAT. § 201-1, *ET SEQ.*

659.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

660.    This claim is brought by the plaintiffs on behalf of residents of Pennsylvania who are members of the class.

---

[137] Or. Rev. Stat. § 646.608(1).

[138] *Id.*

661.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits "unfair or deceptive acts or practices," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[139]

662.    The defendant, plaintiffs, and class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

663.    The plaintiffs purchased analog insulin primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

664.    All of the acts complained of herein were perpetrated by the defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

665.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Pennsylvania CPL.

666.    In addition, the defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the Pennsylvania CPL.

667.    Defendant is liable to the plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.[140] Plaintiffs are also entitled to an award of punitive damages because the defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

---

[139] 73 Pa. Cons. Stat. § 201-2(4).

[140] 73 Pa. Cons. Stat. § 201-9.2(a).

- 163 -

## COUNT FORTY-FIVE

### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### R.I. GEN. LAWS § 6-13.1, *ET SEQ.*

668.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

669.    This claim is brought by the plaintiffs on behalf of residents of Rhode Island who are members of the class.

670.    Rhode Island's Unfair Trade Practices and Consumer Protection Act (Rhode Island CPA) prohibits "unfair or deceptive acts or practices," including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "[e]ngaging in any act or practice that is unfair or deceptive to the consumer;" and "[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect."[141]

671.    The defendant, plaintiffs, and class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

672.    The defendant was engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

673.    The plaintiffs purchased analog insulin primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

674.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Rhode Island CPA.

---

[141] R.I. Gen. Laws § 6-13.1-1(6).

- 164 -

675.    In addition, the defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the Rhode Island CPA.

676.    The plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a). The plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT FORTY-SIX

### VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### S.C. CODE ANN. § 39-5-10, *ET SEQ.*

677.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

678.    This claim is brought by the plaintiffs on behalf of residents of South Carolina who are members of the class.

679.    The South Carolina Unfair Trade Practices Act (South Carolina UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[142]

680.    Defendant is a "person" under S.C. Code Ann. § 39-5-10.

681.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the South Carolina UTPA.

682.    In addition, the defendant's conduct, as described in this complaint, constitutes "unfair" acts in violation of the South Carolina UTPA.

683.    Pursuant to S.C. Code Ann. § 39-5-140(a), the plaintiffs seek monetary relief to recover their economic losses. Because the defendant's actions were willful and knowing, the plaintiffs' damages should be trebled.

---

[142] S.C. Code Ann. § 39-5-20(a).

- 165 -

684.     The plaintiffs further allege that the defendant's malicious and deliberate conduct

warrants an assessment of punitive damages because the defendant carried out despicable

conduct with willful and conscious disregard of the rights and safety of others, subjecting the

plaintiffs to cruel and unjust hardship as a result. The defendant misrepresented the actual prices

of insulin, inflated benchmark prices, and concealed the reasons for and amount of the rebates

offered to PBMs to increase profits at the expense of consumers. Lilly manipulated the prices of

its life-saving product without regard to the impact of the scheme on consumers' ability to afford

life-saving medicines. The defendant's unlawful conduct constitutes malice, oppression, and

fraud warranting punitive damages.

685.     The plaintiffs further seek an order enjoining defendant's unfair or deceptive acts

or practices.

## COUNT FORTY-SEVEN

### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW
### S.D. CODIFIED LAWS § 37-24-6, *ET SEQ.*

686.     Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs.

687.     This claim is brought by the plaintiffs on behalf of residents of South Dakota who

are members of the class.

688.     The South Dakota Deceptive Trade Practices and Consumer Protection Law

(South Dakota CPL) prohibits deceptive acts or practices. Such acts and practices include:

"Knowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense,

false promises, or misrepresentation or to conceal, suppress, or omit any material fact in

connection with the sale or advertisement of any merchandise, regardless of whether any person

has in fact been misled, deceived, or damaged thereby" and "[a]dvertis[ing] price reductions

- 166 -

without . . . [i]ncluding in the advertisement the specific basis for the claim of a price reduction or [o]ffering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement."[143]

689.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the South Dakota CPL.

690.    Under S.D. Codified Laws § 37-24-31, the plaintiffs are entitled to recovery of their actual damages as a result of the defendant's acts and practices.

## COUNT FORTY-EIGHT

### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT TENN. CODE ANN. § 47-18-101, *ET SEQ.*

691.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

692.    This claim is brought by the plaintiffs on behalf of residents of Tennessee who are members of the class.

693.    Tennessee Consumer Protection Act (Tennessee CPA) prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."[144]

694.    The plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

695.    Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

---

[143] S.D. Codified Laws § 37-24-6(1).

[144] Tenn. Code Ann. § 47-18-104.

696.     Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

697.     The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Tennessee CPA.

698.     Pursuant to Tenn. Code Ann. § 47-18-109(a), the plaintiffs seek monetary relief measured as actual damages in an amount to be determined at trial, treble damages as a result of defendant's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FORTY-NINE

### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### TEX. BUS. & COM. CODE § 17.41, *ET SEQ.*

699.     The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

700.     This claim is brought by the plaintiffs on behalf of residents of Texas who are members of the class.

701.     Plaintiffs are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).[145]

702.     The Texas Deceptive Trade Practices-Consumer Protection Act (TDTPA) provides: "(a) A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter;

---

[145] *See* Tex. Bus. & Com. Code § 17.41.

and (B) relied on by a consumer to the consumer's detriment; . . . [and] ([2]) any unconscionable action or course of action by any person . . . .[146]

703.    The TDTPA defines an "unconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."[147] The Texas courts further define an unconscionable act as "one that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a 'grossly unfair degree,' or which results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration."[148]

704.    As alleged in this complaint, the defendant has engaged in false, misleading, or deceptive acts.

705.    Lilly has also engaged in unconscionable actions in violation of the TDTPA. Defendant knew, or had reason to know, that consumers would rely on the reported benchmark price as the prices of insulin. And it knew that the benchmark prices were not fair or reasonable approximations of the actual cost of those analog insulins.

---

[146] *Id.* § 17.50.

[147] *Id.* § 17.45(5).

[148] *Brennan v. Manning*, No. 07-06-0041-CV, 2007 WL 1098476, at *5 (Tex. App. Apr. 12, 2007); *see also Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 623, 2017 WL 3298391, at *11 (Tex. Ct. App. Aug 3, 2017) ("The DTPA defines '[u]nconscionable action or course of action' as 'an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.'" (quoting Tex. Bus. & Comm. Code Ann. § 17.45(5))); *Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 WL 5007777, at *4 (N.D. Tex. Oct. 17, 2012), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F. App'x 412 (5th Cir. 2013); *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 988 (S.D. Tex. 2012).

706.     Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the plaintiffs seek monetary relief measured as actual damages in an amount to be determined at trial, treble damages for defendant's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

707.     Alternatively, or additionally, pursuant to Tex. Bus. & Com. Code § 17.50(b)(3) & (4), the plaintiffs who purchased analog insulin from the defendant in the class period are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on the defendant's violations of the Texas DTPA.

708.     The plaintiffs are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the Texas DTPA.

709.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Tex. Bus. & Com. Code § 17.505(a) to defendant. Because the defendant failed to remedy their unlawful conduct within the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT FIFTY

### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
### UTAH CODE § 13-11-1, *ET SEQ.*

710.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

711.     This claim is brought by the plaintiffs on behalf of residents of Utah who are members of the class.

- 170 -

712.     The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."[149]

713.     "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.[150]

714.     As alleged in this complaint, the defendant has engaged in deceptive acts in violation of the Utah CSPA.

715.     Lilly has also engaged in unconscionable actions in violation of the Utah CSPA. Defendant knew, or had reason to know, that consumers would rely on the reported benchmark price as the prices of insulin. And it knew that the benchmark prices were not fair or reasonable approximations of the actual cost of those analog insulins.

716.     Pursuant to Utah Code Ann. § 13-11-4, the plaintiffs seek: monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT FIFTY-ONE

## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
## VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*

717.     The plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

718.     This claim is brought by the plaintiffs on behalf of residents of Vermont who are members of the class.

---

[149] Utah Code § 13-11-4.

[150] *Id.* § 13-11-5.

- 171 -

719.    The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."[151]

720.    Defendant was seller within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

721.    Defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Vermont CFA.

722.    Defendant's conduct, as described in this complaint, constitutes "unfair acts" in violation of the Vermont CFA.

723.    The plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## COUNT FIFTY-TWO

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
### VA. CODE ANN. §§ 59.1-196, ET SEQ.

724.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

725.    This claim is brought by the plaintiffs on behalf of residents of Virginia who are members of the class.

726.    The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "fraudulent acts or practices" which include: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" and "[u]sing any other

---

[151] Vt. Stat. Ann. tit. 9, § 2453(a).

deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."[152]

727.     Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

728.     The defendant's advertisements of the analog insulins' benchmark prices were "consumer transactions" within the meaning of Va. Code Ann. § 59.1-198.

729.     The defendant's conduct, as described in this complaint, constitutes "fraudulent acts" in violation of the Virginia CPA.

730.     Pursuant to Va. Code Ann. § 59.1-204, the plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff. Because the defendant's conduct was committed willfully and knowingly, the plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

731.     The plaintiffs also seek an order enjoining unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

## COUNT FIFTY-THREE

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT
### REV. CODE WASH. § 19.86.010, *ET SEQ.*

732.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

733.     This claim is brought by the plaintiffs on behalf of residents of Washington who are members of the class.

---

[152] Va. Code Ann. § 59.1-200.

734.    The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[153]

735.    Defendant committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Rev. Code. Wash. § 19.86.010.

736.    The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Washington CPA.

737.    The defendant's conduct, as described in this complaint, constitutes "unfair acts" in violation of the Washington CPA.

738.    Defendant is liable to the plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Rev. Code. Wash. § 19.86.090.

## COUNT FIFTY-FOUR

### VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
### W. VA. CODE § 46A-1-101, *ET SEQ.*

739.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

740.    This claim is brought by the plaintiffs on behalf of residents of West Virginia who are members of the class.

---

[153] Rev. Code. Wash. § 19.86.020.

741.    The West Virginia Consumer Credit and Protection Act (West Virginia CCPA)

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."[154]

Without limitation, "unfair or deceptive" acts or practices include:

> (I)    Advertising goods or services with intent not to sell them as advertised;
>
> . . .
>
> (K)    Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;
>
> (L)    Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;
>
> (M)    The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;
>
> (N)    Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.[155]

742.    The defendant is a "person" under W. Va. Code § 46A-1-102(31).

743.    The plaintiffs are "consumers," as defined by W. Va. Code § 46A-6-102(2).

744.    The defendant engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

---

[154] W. Va. Code § 46A-6-104.

[155] *Id.* § 46A-6-102(7).

745.     The defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the West Virginia CCPA.

746.     The defendant's conduct, as described in this complaint, constitutes "unfair acts" in violation of the West Virginia CCPA.

747.     Pursuant to W. Va. Code § 46A-6-106, the plaintiffs seek monetary relief against the defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each plaintiff.

748.     Plaintiffs also seek punitive damages against the defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting plaintiffs to cruel and unjust hardship as a result.

749.     Plaintiffs further seek an order enjoining the defendant's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, *et seq*., and any other just and proper relief available under the West Virginia CCPA.

750.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with W. Va. Code § 46A-6-106(b) to the defendant. Because the defendant failed to remedy their unlawful conduct within the requisite time period, the plaintiffs seek all damages and relief to which they are entitled.

## COUNT FIFTY-FIVE

### VIOLATION OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### WIS. STAT. § 110.18

751.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

752.    This claim is brought by the plaintiffs on behalf of residents of Wisconsin who are members of the class.

753.    The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading."[156]

754.    Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

755.    Plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiffs purchased analog insulin.

756.    Defendant's conduct, as described in this complaint, constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

757.    Plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2). Because defendant's conduct was committed knowingly and/or intentionally, plaintiffs are entitled to treble damages.

758.    Plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

## COUNT FIFTY-SIX

### VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### WYO. STAT. §§ 40-12-105 *ET SEQ.*

759.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

760.    This claim is brought by plaintiffs on behalf of residents of Wyoming who are members of the class.

---

[156] Wis. Stat. § 100.18(1).

761.     The Wyoming Consumer Protection Act (Wyoming CPA) prohibits a persons from engaging in deceptive trade practices, which include: making "false or misleading statements of fact concerning the price of merchandise or the reason for, existence of, or amounts of a price reduction" and engaging "in unfair or deceptive acts or practices."[157]

762.     Defendant and plaintiffs are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

763.     Plaintiffs engaged in "consumer transactions" as defined by Wyo. Stat. § 40-12-102(a)(ii).

764.     Defendant's conduct, as described in this complaint, constitutes "deceptive acts" in violation of the Wyoming CPA.

765.     Defendant's conduct, as described in this complaint, constitutes "unfair acts" in violation of the Wyoming CPA.

766.     Pursuant to Wyo. Stat. § 40-12-108(a), the plaintiffs seek monetary relief against defendant measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

767.     On January 24, 2017, and January 25, 2017, the plaintiffs sent letters complying with Wyo. Stat. §§ 45-12-109 to the defendant. Because the defendant failed to remedy its unlawful conduct, the plaintiffs seek all damages and relief to which they are entitled.

768.     Pursuant to applicable state statutes, plaintiffs will mail a copy of this action to the Attorney General's office for the states of Connecticut, Illinois, Louisiana, Missouri, New Jersey, Oregon, Texas, Utah, and Washington.

---

[157] Wyo. Stat. § 40-12-105(a).

- 178 -

## DEMAND FOR JUDGMENT

WHEREFORE, the plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.      Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare the plaintiffs as the representatives of the class;

B.      Enter judgments against the defendant and in favor of the plaintiffs and the class;

C.      Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

D.      Award the plaintiffs and the class their costs of suit, including reasonable attorneys' fees as provided by law;

E.      Enjoin the Lilly from continuing to raise their benchmark prices while concealing their net prices to CVS, Express Scripts, and OptumRx; and

F.      Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

010646-11 1023320 V1

Dated: March 29, 2017

Respectfully submitted,

MCINTYRE TATE LLP
By /s/Stephen M. Prignano
    Stephen M. Prignano, Esquire #3649
321 South Main Street, Suite 400
Providence, Rhode Island 02903
Telephone: (401) 351-7700
Facsimile: 401-331-6095
smp@mtlesq.com

Steve W. Berman (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Thomas M. Sobol (RI Bar No. 5055)
Hannah W. Brennan (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

James E. Cecchi (*pro hac vice* to be applied for)
Lindsey H. Taylor (*pro hac vice* to be applied for)
CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

010646-11 1023320 V1

Craig L. Briskin (*pro hac vice* to be applied for)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue NW, Suite 300
Washington, D.C. 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cbriskin@findjustice.com

Linda P. Nussbaum (*pro hac vice* to be applied for)
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036-8718
Telephone: (917) 438-9102
lnussbaum@nussbaumpc.com

Michael E. Criden (*pro hac vice* to be applied for)
Lindsey C. Grossman (*pro hac vice* to be applied
for)
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
mcriden@Cridenlove.com
lgrossman@cridenlove.com

Jayne A. Goldstein (*pro hac vice* to be applied for)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jgoldstein@sfmslaw.com

Natalie Finkelman Bennett (*pro hac vice* to be
applied for)
SHEPHERD FINKELMAN MILLER & SHAH, LLP
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
nfinkelman@sfmslaw.com

- 181 -

Roberta D. Liebenberg (*pro hac vice* to be applied for)
Adam J. Pessin (*pro hac vice* to be applied for)
FINE, KAPLAN AND BLACK, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile: (215) 568-5872
rliebenberg@finekaplan.com
apessin@finekaplan.com

Lynn Lincoln Sarko (*pro hac vice* to be applied for)
Derek W. Loeser (*pro hac vice* to be applied for)
Gretchen S. Obrist (*pro hac vice* to be applied for)
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
gobrist@kellerrohrback.com

Michael Critchley (*pro hac vice* to be applied for)
CRITCHLEY, KINUM & DENOIA, LLC
75 Livingston Avenue, Suite 303
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Facsimile: (973) 422-9700
mcritchley@critchleylaw.com

Ellen Relkin (*pro hac vice* to be applied for)
WEITZ & LUXENBERG
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone: (212) 558-5500
ERelkin@weitzlux.com

Paul F. Novak (*pro hac vice* to be applied for)
Diana Gjonaj (*pro hac vice* to be applied for)
Gregory Stamatopoulos (*pro hac vice* to be applied for)
WEITZ & LUXENBERG
719 Griswold, Ste. 620
Detroit, MI 48226
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com

Todd A. Seaver (*pro hac vice* to be applied for)
Jessica Moy (*pro hac vice* to be applied for)
BERMAN TABACCO
44 Montgomery St., Ste. 650
San Francisco, CA 94104
Telephone: (415) 433-3200
tseaver@bermantabacco.com
jmoy@bermantabacco.com

Nyran Rose Rasche (*pro hac vice* to be applied for)
CAFFERTY CLOBES MERIWETHER &
SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60601
Telephone: (312) 782-4880
nrasche@caffertyclobes.com

Stephen H. Weil (*pro hac vice* to be applied for)
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
Telephone: 312-585-7404
steve@weilchardon.com

*Attorneys for Plaintiffs*

010646-11 1023320 V1